**UNITED STATES of America, Appellee,**

v.

**Anthony J. Pivorotto, John Robert WOODS.**

**John Robert Woods, Appellant.**

No. 92–3207.

United States Court of Appeals, Third Circuit.

Argued Oct. 27, 1992.

Decided Feb. 22, 1993.

John R. Carroll, (argued), Peter W. Cooley, Carroll & Carroll, Philadelphia, PA, for appellant.

Paul J. Brysh, (argued), Office of U.S. Atty., Pittsburgh, PA, for appellee.

Before: BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

In *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Supreme Court held that under the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3579, 3580 (recodified at 18

U.S.C. §§ 3663, 3664 as of November 1, 1987) ("VWPA"), courts have the authority to order restitution only for the offense of conviction. This appeal requires us to decide whether this rule retroactively applies to a pre-*Hughey* restitution order authorized under the Federal Probation Act, 18 U.S.C. § 3651 (repealed, effective November 1, 1987) ("FPA"), which has already been paid in full by the defendant.

The defendant-appellant, John Robert Woods, was convicted of defrauding numerous investors in a mail fraud scheme. Woods argues that the restitution order on the counts for which he was not convicted are illegal under *Hughey*, and that his sentence therefore should be invalidated under Rule 35, Fed.R.Crim.P. Woods contends that *Hughey* should be retroactively applied to him, and that, so applied, the portion of his restitution order that did not stem from the offenses for which he was convicted ($452,579.53) should be set aside as unauthorized by the FPA. He seeks repayment of that sum by the government, even though the government received the money only as a conduit for the victims whose losses Woods has not denied causing.

We conclude that *Hughey* should not be retroactively applied to Woods in his Rule 35(a) motion. The question of *Hughey*'s retroactivity does not fit neatly under either the substantive standard for determining retroactivity, *see Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), or the procedural standard, *see Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). However, both standards reflect the rule that courts will not ordinarily apply new decisions of criminal law retroactively without substantial justification. We

glean from *Teague* and *Davis* that we should apply *Hughey* retroactively only if Woods demonstrates that to do otherwise would result in a serious miscarriage of justice. Because we conclude that Woods has not made this showing, we will affirm the district court order denying Woods' Rule 35(a) motion.

## I. FACTS AND PROCEDURAL HISTORY

On October 17, 1984 a grand jury returned a 35–count indictment that charged Woods and his co-defendant, Anthony Pivorotto, with mail fraud and bankruptcy fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 152. The indictment alleged that from August 24, 1973 through June 13, 1980, Pivorotto and Woods engaged in a scheme to defraud the investors of the Safeguard Investment Company, which they jointly managed. The indictment charged that as a result of the fraudulent scheme, "approximately 234 investors who had deposited, reinvested and maintained moneys and funds in Safeguard ... were defrauded of approximately $3,278,673." [1]

On January 29, 1985, Woods pled guilty to Counts 8 and 13 of the indictment, which charged him with using the mails in a scheme to defraud. In exchange, the government dismissed the remaining 33 counts. Through this plea agreement, Woods pled guilty to the fraud of only two investors, Sam and/or Elsie Fanelli. The plea agreement neither recommended a specific sentence nor referred to the possible imposition of a restitution order.

Before accepting the plea, the district court engaged in a lengthy Rule 11 colloquy in which it informed Woods and Pivo-

---

**1.** The details of the scheme are set forth in our previous opinion which addressed Woods' restitution order under the law as understood prior to *Hughey*. *See United States v. Woods*, 775 F.2d 82 (3d Cir.1985) (*Woods I*). Briefly summarized, Safeguard solicited money from investors for the avowed purpose of making residential mortgage loans. However, in August of 1973 Safeguard stopped making mortgage loans to the general public and instead began to make "unsecured loans" of over one million dollars to Woods and Pivorotto and to businesses they

controlled. Therefore, rather than promote mortgage loans, Safeguard effectively gave the investors' money to Pivorotto and Woods—although some money was also used to pay some interest on deposits held by Safeguard. In addition, Safeguard misrepresented to investors that their deposits were federally insured. It also misled investors into thinking that the company was licensed as a banking institution by the Department of Banking of Pennsylvania. In May, 1980, Safeguard filed a petition in bankruptcy under Chapter 11.

rotto of its intention to require them to pay restitution to the victims of their crimes. Toward this end, the court requested Woods and Pivorotto to provide the Probation Office with detailed financial statements, sworn to under oath. Because there was a strong argument that the defendants' assets were primarily the result of the fraudulent scheme, the court placed the burden on Woods and Pivorotto to separate their legally and illegally acquired holdings. The court also asked the Probation Office, in consultation with the U.S. Attorneys' Office, to use these statements in compiling a presentence report that detailed the claims of the Safeguard investors and the current assets of Woods and Pivorotto. Specifically, the presentence report was to contain the Probation Office's determination of the amount of the original deposits made by Safeguard investors as well as the amount of interest owed to the investors.

At a sentencing hearing held four months later, the district court reviewed the presentence report in depth and heard testimony from several witnesses for the defense. The court concluded that the Safeguard investors had suffered a $1.8 million loss of principal. That figure represented the principal of the investors' deposits, minus the withdrawals made from the funds, minus the interest the investors would have earned on the funds, and minus the money already disbursed to the investors by Safeguard's trustee in bankruptcy.

The district court imposed on Woods and Pivorotto a joint restitution obligation of $989,218, of which Woods was required to pay $457,338. The court arrived at this figure after analyzing the presentence report and taking into consideration the defendants' ability to repay the Safeguard investors. This restitution order reflected only the amount of principal the court determined that Pivorotto and Woods owed the defrauded investors of Safeguard and, as mentioned above, excluded the interest

owed to the investors. The district court also sentenced Woods to two years of imprisonment on count 8 of the indictment and five years on count 13. However, the court suspended the latter sentence in favor of five years of probation, conditioned on the payment of the restitution order pursuant to the FPA, 18 U.S.C. § 3651.

Woods appealed the restitution order, which this court affirmed in *United States v. Woods,* 775 F.2d 82 (3d Cir.1985) (*Woods I*). Rejecting Woods' challenge, we held that the restitution order was proper even though it represented the victims' losses from the entire scheme and not just the counts to which Woods had pled guilty.[2] Woods had pled guilty to acts in furtherance of a unitary scheme to defraud and we reasoned that where the offense is a scheme to defraud, each count of mail fraud was simply an act in furtherance of the scheme and hence the district court had the authority to direct restitution for the entire scheme. *Id.* at 87–88.

In May of 1990, the Supreme Court decided *Hughey v. United States,* which vacated a restitution order imposed pursuant to the VWPA, 18 U.S.C. § 3579(a)(1) (1982 ed. and Supp. IV). In *Hughey,* a grand jury had indicted the defendant for three counts of theft by a Postal employee and three counts of use of an unauthorized credit card. Although Hughey pled guilty to only one count of each offense in return for the dismissal of the remaining counts, the district court ordered restitution for the losses stemming from the other credit cards Hughey was alleged to have stolen in the indictment. The Supreme Court held that this restitution order violated the language of the VWPA, which provided that a "defendant convicted of any offense" may be ordered to "make restitution to any victim of such offense." 18 U.S.C. § 3579(a)(1). Applying basic principles of statutory construction, the Court concluded that the language of the VWPA authorized

---

**2.** We also held that the district court had not violated the requirements of Rule 11(e)(4), Fed. R.Crim.P. (rejection of a plea agreement). We held that even though the plea agreement had not mentioned that restitution could be im-

posed, the court had told Woods in unequivocal terms that he would be required to pay restitution and had given him sufficient opportunity to withdraw his plea. *See* 775 F.2d at 85–86.

restitution only for losses stemming from the offenses for which Hughey had been convicted and not the dismissed charges.

By 1990, when the Court decided *Hughey*, Woods had already served his two-year prison sentence on count 8, had fully paid his portion of the $989,218 restitution order—which totalled $457,338 [3]—and had served slightly more than two years of his five year period of probation.[4] In January, 1992, relying on *Hughey*, Woods filed a motion pursuant to Fed.R.Crim.P. 35(a) to vacate the portion of the restitution order which exceeded $4,758.47, the amount of loss underlying count 13, the mail fraud count for which he was convicted and for which he received probation. Woods sought the repayment of $452,579.53 the alleged excess restitution ($457,338.00 minus $4,758.47).

In April, 1992, the district court entered an order denying Woods' Rule 35(a) motion. The court concluded that *Hughey* should not be retroactively applied to Woods' sentence. In the alternative, the court found that even if *Hughey* were retroactively applied, it was not controlling because (1) *Hughey* concerned the proper interpretation of the VWPA, not the FPA under which Woods was sentenced; and (2) even if *Hughey* restricted restitution orders pursuant to the FPA, it did not apply when the defendant was someone who, like Woods, had been convicted of crime that required proof of a "unitary scheme" to defraud.

■ This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the district court's denial of the Rule 35(a) motion is plenary "since the legality of the sentence imposed by the district court is being challenged." *United States v. Kress*, 944 F.2d 155, 158 (3d Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992). We note that under Rule 35(a), Woods bears the burden of proving the illegality of his sentence. *See* Mark S. Rhodes, 5 Orfield's Criminal Procedure Under the Federal Rules § 35.-15, at 433–34 (2d ed. 1987).[5]

## II. DISCUSSION

### A. *Contentions of the Parties*

Woods contends that, although in *Hughey* the Court invalidated a restitution order under the VWPA, the Court's reasoning applies equally to restitution orders

---

**3.** At argument, the government informed us that approximately $23,000 remains undistributed because of difficulties the Probation Office encountered in locating all the defrauded investors in the Safeguard Investment Company.

**4.** Woods completed his probationary period on October 2, 1991.

**5.** The parties have raised a number of issues that we do not reach because of our conclusion that *Hughey* should not be retroactively applied to Woods.

Woods asserts that although in *Hughey* the Supreme Court struck down a restitutionary obligation issued pursuant to the VWPA, *Hughey's* holding applies to restitution orders under the FPA as well. The government responds that *Hughey's* holding is limited to the VWPA and does not apply to restitution orders under the FPA.

The government argues, in the alternative, that *Hughey* does not apply to restitution orders imposed on defendants who, like Woods, were convicted of a crime that required proof that it was part of a "unified" or "unitary scheme." However, subsequent to the district court's opinion and the submission of briefs on appeal, we have, in a VWPA case, rejected the argument that a there is a "unitary scheme" exception to *Hughey's* holding. *See United States v. Seligsohn*, 981 F.2d 1418, 1421 (3d Cir.1992).

The government further contends that Woods' consent before the district court to the restitution order serves to validate it. Woods responds that if Congress has not provided the district court the authority to order a restitutionary sum, a defendant's consent cannot supply it.

In addition, the government argues that should we hold *Hughey* retroactive and find the restitution order overbroad, we should remand Woods' case to the district court for resentencing. The government argues that if we vacate part of the restitution order, the district court would have the authority to resentence Woods to a term of imprisonment up to the statutory maximum in prison for his convictions and that this act would not offend the Double Jeopardy Clause. Woods responds that Rule 35(a) does not grant the district court this resentencing authority and that such resentencing would violate Double Jeopardy.

Finally, the government contends that sovereign immunity prevents Woods from recovering money from the government. *See infra* note 23 (discussing the sovereign immunity and Tucker Act issues).

under the FPA. Woods asserts that under the FPA the district court had no authority to order restitution for offenses of which he was never actually convicted. Accordingly, Woods submits that to the extent the restitution order exceeded the $4,758.47 he owed the Fanelli couple, it was illegal within the meaning of Rule 35. *See infra* n. 7. The government responds that the restitution order should stand because *Hughey* applies only to the VWPA and not the FPA.

However, as both Woods and the government recognize, before we can reach the proper interpretation of *Hughey*, we must independently determine whether *Hughey* should be retroactively applied to Woods' Rule 35 motion.[6] Woods argues that because his Rule 35 motion is a part of the original case rather than a collateral attack, an intervening change of law, such as *Hughey*, should be retroactively applied. In the alternative, Woods contends that even if we utilize the retroactivity analysis appropriate to collateral challenges, we should hold *Hughey* retroactive here. Specifically, Woods asserts that for retroactivity purposes we should treat *Hughey* as a new substantive, rather than a procedural, rule and should hold that Woods was subjected to a sufficiently substantial injustice to warrant *Hughey's* retroactive application. The government responds that we should apply the retroactivity analysis appropriate for new rules of criminal procedure, and that under this doctrinal rubric, *Hughey* may not be retroactively applied.

### B. *Procedural Posture of Woods' Suit: Retroactivity under Rule 35(a)*

Because the events giving rise to his conviction occurred before November 1, 1987, Woods proceeds under old Rule 35(a), which authorizes the court to correct an illegal sentence at any time.[7] However, we reject Woods' contention that under Rule 35, intervening changes in law are automatically retroactively applied.[8] Our legal system has a strong interest in the finality of adjudication. Accordingly, we do not apply new judicial decisions retroactively without substantial justification. For example, in civil adjudication, the general rule under Fed.R.Civ.P. 60(b) is that a judgment will not be disturbed despite a change in the law. *See generally* 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2864, at 223 (1973). In criminal adjudication as well, dating back to the Court's decision in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14

---

**6.** In treating retroactivity as a threshold question, we follow the Supreme Court's approach in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), which treated retroactivity as a dispositive, threshold question. We also track our approach in *United States v. Osser*, 864 F.2d 1056, 1058 (3d Cir. 1988), in which we addressed the retroactivity issue first. *But see United States v. Bennett*, 943 F.2d 738, 741 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992) (analyzing *Hughey's* retroactivity after addressing the substance of the defendant's argument).

**7.** Offenses committed prior to November 1, 1987 are governed by the former version of Rule 35, which provided that:

(a) Correction of Sentence. The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence.
(b) Reduction of Sentence. A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation is revoked, or within 120 days after

receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review, or having the effect of upholding, a judgment of conviction or probation revocation. The court shall determine the motion within a reasonable time. Changing a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under the subdivision.

Rule 35, Fed.R.Crim.P. (1982). This provision was changed by amendment in 1986. Pub.L. 98–473, Title II, § 215(b), 98 Stat. 2015.

**8.** In our analysis of the retroactivity of *Hughey* to Woods' motion, we assume without deciding that, should *Hughey* be retroactively applied here, it would apply to Woods' restitution order even though it was imposed pursuant to the FPA rather than the VWPA, the statute at issue in *Hughey*. Cf. *Davis v. United States*, 417 U.S. 333, 342 & n. 12, 94 S.Ct. 2298, 2303 & n. 12, 41 L.Ed.2d 109 (1974) (accepting, for retroactivity analysis, defendant's assertion that new criminal decision was correctly decided and relevant to his conviction).

L.Ed.2d 601 (1965), there has been a trend, albeit one with many twists and turns, toward limitations on retroactive application of new criminal rules.[9]

This background interest in finality should not be ignored simply because a case arises under Rule 35. As the Fifth Circuit has aptly explained:

> The fact that a motion under rule 35 is one "made in the original case," does not, of course, mean that all of the judgments rendered at the original sentencing proceeding are automatically reopened upon the making of a such a motion. That ... would fly in the face of the notions of finality that are so basic in our judicial system. Rule 35 was not designed as a vehicle to reopen final judgments long since past ripe for review.

*United States v. Henry*, 709 F.2d 298, 314 n. 23 (5th Cir.1983) (citing *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959)). In addition, as we explain below, *see infra* page 682, the interest in finality is heightened when a sentence has been completed, the situation in the instant case. *See United States v. Osser*, 864 F.2d 1056, 1059 (3d Cir.1988).

The plain language of Rule 35(a), which simply states that a court "may correct an illegal sentence at any time" does not speak directly to the retroactivity issue. However, the use of the word "may" in the rule indicates that courts are free to apply reasonable and prudential limitations on the correction of illegal sentences. Rule 35's permissive rather than mandatory language therefore suggests that sound restrictions on the retroactive application of new rules of law are appropriate.

We note that the legislative history of Rule 35 reveals nothing to the contrary. Rule 35 was first promulgated in 1946 pursuant to the Act of March 8, 1934, ch. 49, 48 Stat. 399 (current version at 18 U.S.C. § 3772). The Advisory Committee Notes to the rule explain only that the rule was intended to "continue[ ] existing [decisional] law." They do not in any way address a court's power, when applying Rule 35 to apply new criminal rules retrospectively.[10]

Finally, the lack of a limitation on when a Rule 35(a) motion may be brought suggests that courts should impose some restriction on the retroactive application of new judicial decisions in order to place reasonable limitations on the reopening of sentences. *Cf. United States v. Katzin*, 824 F.2d 234, 241 (3d Cir.1987) (because no time require-

---

**9.** We note that the approach espoused in *Linkletter v. Walker* was discredited by a plurality of the Court in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), a decision which further restricted the retroactive application of new rules of criminal procedure on collateral review.

**10.** Moreover, we do not read *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), which Woods has cited, to require us automatically to apply new decisions retroactively in Rule 35 motions. Treating the defendant's case as a Rule 35(a) motion, the Court in *Heflin*, pursuant to its decision in *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), invalidated the defendant's sentence under both 18 U.S.C. § 2113(c) and (d) because it punished him for both the felonious taking and receipt of stolen property, which the Court had found unauthorized in *Prince*. Although the Court in *Heflin* applied *Prince* retroactively, it did so without discussion. To the extent *Heflin* may have ever stood for the retroactive application of new decisions in Rule 35(a) motions, that interpretation is no longer authoritative in light of the Court's subsequent jurisprudence.

In contrast to current retroactivity doctrine, when *Heflin* was decided the Court typically, and without discussion, applied new criminal judicial decisions retroactively. *See Linkletter v. Walker*, 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) ("It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule"); *accord Robinson v. Neil*, 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973). *See generally* William J. Sheils, Note, *Nonretroactivity in Habeas Corpus*, 24 Suffolk U.L.Rev. 743 (discussing Supreme Court's approach to retroactivity of constitutional decisions pre-*Linkletter*). The Court handed down *Heflin* prior to its landmark decision in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), in which the Court began a trend which has developed over the last thirty years toward greater restrictions on retroactivity in criminal adjudication. In fact, *Heflin* merely reflects the fact that there is no unique retroactivity analysis appropriate for Rule 35(a). Rather, courts should apply the rules that govern retroactivity generally.

ment limits jurisdiction under Rule 35 or 28 U.S.C. § 2255 "courts have invoked them only to correct 'fundamental' errors") (citing *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)).

### C. The Appropriate Standard for Retroactivity

The first step in determining the appropriate standard for retroactivity in this hybrid case is to locate the correct source of authority. We find helpful the retroactivity jurisprudence that has been developed in coram nobis and §§ 2254 and 2255 actions.[11] As the Fifth Circuit has observed, "[c]oncerns that the Supreme Court has expressed about the scope of section 2255 may ... inform our judgment about rule 35." *United States v. Henry*, 709 F.2d 298, 313 (5th Cir.1983).

■ Rule 35(a) is functionally similar to both coram nobis and 28 U.S.C. §§ 2254 and 2255.[12] There are differences, of course. For a defendant to bring an action under §§ 2254 and 2255, he or she must be in custody. To utilize coram nobis, the defendant must have completely served the sentence. *See* 3 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 27.10, at 404 (1984). Rule 35(a), in contrast, imposes no limitations on when a defendant can bring a motion to correct an illegal sentence. In addition, Rule 35(a) allows a defendant only to challenge the legality of the sentence, and not the conviction. *See Hill v. United States*, 368 U.S. 424, 430, 82 S.Ct. 468, 472, 7 L.Ed.2d 417 (1962). But notwithstanding these differences, habeas corpus and coram nobis, like Rule 35(a), serve as exceptions to the principle of finality: each serves as a procedural device

enabling defendants to relitigate previously decided issues. *See United States v. Henry*, 709 F.2d 298, 313 (5th Cir.1983). *See also Hill*, 368 U.S. at 430, 82 S.Ct. at 472 (construing a motion to vacate a sentence under § 2255 as a motion under Rule 35). Hence we draw instruction from the retroactivity jurisprudence developed under §§ 2254 and 2255 and coram nobis.

Under §§ 2254 and 2255, the Supreme Court has created separate retroactivity standards for new rules of criminal procedure and new decisions of substantive criminal law.[13] In *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), the Court articulated the appropriate standard for evaluating the retroactivity of new substantive criminal decisions under § 2255. There the defendant's conviction, although already affirmed by the Ninth Circuit, was called into question by a new Ninth Circuit decision decided on nearly identical facts. Addressing the retroactivity of the new decision, the Supreme Court held that, "the appropriate inquiry [is] whether the claimed error of law was a 'fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t present[s] exceptional circumstances where the need for the remedy afforded' " by collateral relief is apparent. *Id.* at 346, 94 S.Ct. at 2305 (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)). The Court held that the situation presented by *Davis*—in which the defendant may have been convicted for acts that were not considered criminal under the relevant statute—satisfied this standard. It concluded

11. As will appear, our retroactivity discussion resorts far more to the §§ 2254 and 2255 retroactivity jurisprudence than to that of coram nobis because of the paucity of coram nobis decisions.

12. For a more detailed comparison of Rule 35, writs of error coram nobis, and habeas corpus, see Mark S. Rhodes, Orfields' Criminal Procedure Under the Federal Rules § 35.13, at 429–30 (2d ed. 1987).

13. The Court first established this analytic distinction in *Robinson v. Neil*, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). There the Court

held retroactive its decision in *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), which prohibited prosecution of a defendant by both the municipality and the state for the same crime on double jeopardy grounds. The Court declined to analyze *Waller*'s retroactivity under the extant procedural retroactivity standard, that of *Linkletter*, explaining that "[g]uarantees that do not relate to ... procedural rules cannot, for retroactivity purposes, be lumped conveniently together in terms of analysis." *Id.* 409 U.S. at 508, 93 S.Ct. at 878.

that the injustice that would occur but for the retroactive application of the new Ninth Circuit decision was sufficiently egregious to warrant retroactivity.

■ In contrast to the substantive retroactivity standard established in *Davis*, the Court has recently revisited retroactivity doctrine for new rules of criminal procedure raised in habeas corpus suits. In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), the Court discarded the *Linkletter* balancing test and announced a general rule that new criminal procedural rules would be non-retroactive in habeas corpus suits.[14] The Court identified two narrow exceptions to this rule of non-retroactivity. First, a court should apply a new criminal procedural rule retroactively if "it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Id.* at 306, 109 S.Ct. at 1073 (citing *Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971)). Second, under *Teague* a court should apply a new procedural rule retroactively if "it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." *Id.* (citations and internal quotations omitted).

What makes Woods' appeal difficult is that *Hughey* does not fall neatly under either the substantive or procedural doctrinal category.[15] The facts of *Davis* present the paradigm of a case involving a new substantive criminal decision. In *Davis*, as in nearly all the decisions in which courts

have retroactively applied a new substantive criminal decision, the defendant's conviction itself was potentially invalid due to an intervening change in law. *See Davis*, 417 U.S. at 346–47, 94 S.Ct. at 2305. In fact, most of the cases that have applied the *Davis* standard have addressed the retroactivity of the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which invalidated the "intangible rights" theory of liability under the federal mail fraud statute, and have concluded that the *McNally* decision should be retrospectively applied. *See United States v. Osser*, 864 F.2d 1056 (3d Cir.1989); (holding *McNally* retroactive); *United States v. Mitchell*, 867 F.2d 1232 (9th Cir.1989) (same); *Ingber v. Enzor*, 841 F.2d 450 (2d Cir.1988) (same); *United States v. Shelton*, 848 F.2d 1485 (10th Cir.1988) (same); *United States v. Bonnette*, 781 F.2d 357 (4th Cir.1986) (same). *But see United States v. Callanan*, 671 F.Supp. 487 (E.D.Mich.1987) (holding *McNally* non-retroactive). *See also United States v. Sood*, 969 F.2d 774 (9th Cir.1992) (applying *Davis* analysis to decision that bribery statute only covered officials of states, not U.S. territories). In contrast to *Davis* and these post-*McNally* retroactivity decisions, there is no challenge to the validity of Woods's conviction under the mail fraud statute, 18 U.S.C. § 1341, and *Hughey* has in no way implied that Woods was convicted for acts that the mail fraud statute did not make criminal.

Yet *Hughey*'s holding also cannot readily be defined as a new rule of criminal proce-

14. This is in contrast to the retroactivity rule on direct appeal. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (new decisions will be retroactively applied to all defendants on direct appeal). Based on the combination of its holding in *Griffith* and *Teague, supra*, the Court has adopted the approach toward criminal retroactivity originally espoused by Justice Harlan. *See Mackey v. United States*, 401 U.S. 667, 675–702, 91 S.Ct. 1160, 1164–1165, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part); *Desist v. United States*, 394 U.S. 244, 256–69, 89 S.Ct. 1030, 1037–44, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting). *See generally* Richard H. Fallon & Daniel J. Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104

Harv.L.Rev. 1733 (1991) (discussing history and developments leading to Court's adoption of Justice Harlan's approach).

15. The Supreme Court has acknowledged that for retroactivity purposes, the substantive and procedural categories do not properly describe all new judicial decisions. In *Robinson v. Neil*, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973), in which the Court first expressed the need to distinguish between substantive and procedural criminal law within retroactivity doctrine, the Court explained that, "[w]e would not suggest that the distinction that we draw is an ironclad one that will invariably result in the easy classification of cases in one category or the other." *Id.* at 509, 93 S.Ct. at 878.

dure. In its retroactivity analysis the Court has treated as new rules of criminal procedure such developments as the application to the states of the Fourth Amendment exclusionary rule in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), *see Linkletter v. Walker, supra* (holding *Mapp v. Ohio* non-retroactive), the prohibition on race-based peremptory challenges of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *see Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (holding *Batson* non-retroactive on collateral review for convictions that became final before *Batson* was decided), and the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *see Johnson v. New Jersey,* 384 U.S. 719, 733, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882 (1966) (holding *Miranda* non-retroactive to trials that had occurred prior to the decision). In our view, *Hughey*'s limitation on a district court's authority to order restitution bears little resemblance to what the Court has commonly characterized as a new criminal procedural rule for retroactivity purposes.

■ Rather than try to fit *Hughey* into a doctrinal mold to which it does not properly belong, we think the best approach is to recognize that *Hughey* is neither entirely substantive nor procedural, as those terms have typically been used in the retroactivity context, but rather falls somewhere in between the two. We further recognize that the two separate doctrinal standards that the Court has created for the retroactive application of new rules of substantive and procedural criminal law are not, at bottom, all that different.[16] Rather, there are common animating principles underly-

ing the two. Inherent in both doctrinal formulations is the overarching notion that the interest in finality bears an important place in our legal system such that retroactivity is the exception, not the norm. Consequently, both the procedural and the substantive standards reflect the principle that new decisions will not be retroactively applied without substantial justification. Conversely, both tests account for the fact that if holding a new decision non-retroactive would clearly result in an egregious injustice, then retroactivity is appropriate.

Arguably, this hybrid case lies on a continuum midway between the procedural and substantive standards. Consequently, the proper approach here might be to fashion for *Hughey*'s retroactivity analysis a heightened *Davis* standard, i.e., one in which the defendant's burden of establishing that he has suffered a miscarriage of justice is greater than that in *Davis,* although not as difficult as that in *Teague.* However, rather than risk applying what may be a wooden or unduly formulaic approach, we will analyze *Hughey*'s retroactivity with a view toward the common animating principles underlying the two retroactivity doctrines. We believe this to be a sufficient basis upon which to decide this case.

## D. *Application of the Standard*

■ While we recognize that $457,000 is a very large sum, and that Woods has been forced to disgorge it by what may now be considered an illegal order,[17] we find that Woods has not demonstrated that he suffered the requisite miscarriage of justice. We reach this conclusion based upon a variety of factors.[18] First among these factors

---

**16.** *Teague* recognizes an exception to its general rule of non-retroactivity when the decision in question "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" 489 U.S. at 306, 109 S.Ct. at 1073 (citing *Mackey v. United States,* 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971)). In comparison, *Davis,* dictates that new substantive decisions will be retroactive only when the decisions correct "fundamental defect[s]" which, if left uncorrected, would result in "a complete miscarriage of justice" presenting "exceptional circum-

stances." *Davis,* 417 U.S. at 346, 94 S.Ct. at 2305.

**17.** As we discussed above, *see supra* n. 8, when analyzing the retroactivity of *Hughey,* we assume, without deciding, that *Hughey,* if retroactively applied to Woods, would invalidate that portion of the restitution order based on offenses for which Woods was not convicted.

**18.** Our conclusion that *Hughey* should not be retroactively applied should not imply that all new sentencing decisions should be held non-

is the effort made by the district court to ensure the accuracy of the restitution order along with the absence of any allegation by Woods that the money was not owed the Safeguard investors.

The district court took considerable steps to ensure that it ordered Woods to pay the Safeguard investors only money that he owed them as a result of the fraudulent scheme he executed in conjunction with Pivorotto. In fact, Woods has not contested any of the district court's factual findings underlying its restitution order. *See infra* note 20. The court invested a substantial amount of time and attention in its review and evaluation of the financial statements filed by Woods and Pivorotto, as well as the Probation Office's report on their liability to the Safeguard investors.[19] At the lengthy sentencing hearing, the district court carefully reviewed the presentence report and heard testimony from three defense witnesses.[20]

The district court then made findings with respect to the total amount of the victims' losses, paying specific attention to the amount of deposits lost by the victims. The restitution order included only the investors' lost deposits and none of the lost interest. In formulating the restitution order, the court accounted for Woods' ability to pay and considered which assets Woods acquired as a result of his fraudulent activity. The high degree of care exercised by the court in its determination of the restitution order, as reflected, for example, in its decision not to require the repayment of any lost interest, further persuades us that Woods has not made the necessary showing that the restitution order was flawed by a fundamental defect.[21]

Even if the district court lacked authority under the FPA to order Woods to pay restitution to all of the defrauded Safeguard investors, Woods does not deny—nor does it appear that he could—that he was liable to the Safeguard investors for resti-

retroactive. We note that in addressing a Rule 35(a) motion, the court in *United States v. Bermudez,* 742 F.Supp. 556 (C.D.Cal.1990), retroactively applied a new sentencing decision. The differences between the instant case and *Bermudez* reflect the varying considerations regarding the retroactivity of sentencing decisions that arise in different cases such that our decision today should not establish a general rule with respect to the retroactivity of new sentencing decisions.

In contrast to our approach here, the *Bermudez* court analyzed the sentencing decision as a new substantive rule, and hence has simply applied the *Davis* test. *See id.* at 558. Of course, *Bermudez* involved a different issue from the issue we consider today. Specifically, in *Bermudez* the court held retroactive *United States v. Chatman,* 869 F.2d 525 (9th Cir.1989), which determined that under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B) ("ACCA"), the term "burglary" is limited to the common law definition of burglary. Under *Chatman,* therefore, defendants only receive sentence enhancements for burglaries that fall under the common law definition, which meant that the defendant in *Bermudez* had received unauthorized sentence enhancements, resulting in increased prison time, for two crimes which did not meet the common law definition. *See Bermudez,* 742 F.Supp. at 557. As we see it, that situation more closely resembles the situation in *Davis* than the instant case because in *Bermudez* the defendant received a sentence enhancement for an act that was not deemed a crime under the relevant common law provision.

19. In order to compile its report, the Probation Office contacted the Safeguard investors and verified their claims against the company, in particular, their lost initial deposits entrusted to Safeguard.

20. The district court did not have the benefit of our decision in *United States v. Palma,* 760 F.2d 475 (3d Cir.1985), which requires district courts to make specific findings about facts material to the imposition of criminal restitution under the VWPA. (*Palma* was filed several days after the district court conducted the sentencing hearing). The court nonetheless effectively complied with *Palma's* procedural safeguards. We note that Woods has never argued—either in the instant appeal or in his previous appeal to this court, *see Woods I,* 775 F.2d at 85–86—that the district court failed to take adequate precautions in its fact finding during sentencing, including the safeguards required by *Palma.*

21. We note that this lost interest is different from the pre-judgment interest on restitution awards which we have found unauthorized under the FPA in *United States v. Sleight,* 808 F.2d 1012, 1020 (3d Cir.1987). The interest lost by the Safeguard investors represents the interest payments the investors would have received from the Safeguard Investment Company had their deposits actually been put toward the avowed purpose of Safeguard—the promotion of residential mortgage loans.

tution that could have been enforced through a *civil* proceeding. Woods' underlying civil liability to the Safeguard investors further convinces us that by leaving his restitution payments to those investors undisturbed, we will not cause the type of miscarriage of justice contemplated by *Davis* or the exceptions to *Teague.*

Moreover, that Woods was required to pay *restitution* rather than a fine is further indication that he has not suffered a complete miscarriage of justice for several reasons. First, as just discussed, the restitution order in question represents money that Woods owed the Safeguard investors as a result of a civil liability which Woods has not denied. This pre-existing liability strongly detracts from Woods' claim that he has been subjected to a complete miscarriage of justice. Second, because the court ordered restitution, and not a fine, the government did not retain the money paid, but acted only as a conduit to pass the money along to the Safeguard investors.[22] To now require the government to disgorge money it no longer has would create an unfairness in its own right that we cannot discount in our analysis. Third, while the issue is quite complicated, and need not be decided here, it seems highly unlikely that

Woods could recover his restitution payments from either the government, whose hands the money merely passed through, or the victims themselves, who were entitled to the funds.[23]

■ In concluding that Woods has not demonstrated that the restitution order resulted in the type of miscarriage of justice contemplated by *Teague* or *Davis,* we have placed considerable weight upon the improbability of Woods' ability to recover the money in conjunction with the fact that Woods claims to have been wrongfully deprived not of his liberty, but of his money, to which he had a doubtful claim under the circumstances. As we recognized in *United States v. Pollak,* 844 F.2d 145 (3d Cir. 1988), criminal restitution " 'is imposed as part of sentencing and remains inherently a criminal penalty.' " *Id.* at 153 (citing *United States v. Sleight,* 808 F.2d 1012, 1020 (3d Cir.1987));[24] *see also United States v. Brown,* 744 F.2d 905, 909–910 (2d Cir.1984) (discussing differences between criminally- and civilly-imposed restitution). Yet restitution cannot, for that reason alone, be considered the same as incarceration for retroactivity purposes. If Woods were still

**22.** The sole exception is the $23,000 of undisbursed funds belonging to Safeguard investors that the Probation Office has been unable to locate, *see supra* n. 3.

**23.** Resolution of this question would implicate the doctrine of sovereign immunity, including the jurisdictional limitations of the Tucker Act, 28 U.S.C.A. § 1346(a) (West Supp.1992). We note that Woods would face a number of obstacles before establishing his right to recover from the government under the Tucker Act. For example, the Tucker Act restricts recoveries against the government to $10,000 in actions brought in federal district court, *see* 28 U.S.C.A. § 1346(a)(2) (West Supp.1992), and Woods has requested repayment of over $400,000. Moreover, Woods must establish that the allegedly violated statute, here the FPA, expressly or implicitly contemplates the government's repayment of wrongfully ordered restitution. *See United States v. Mitchell,* 463 U.S. 206, 216–17 & n. 16, 103 S.Ct. 2961, 2967–68 & n. 16, 77 L.Ed.2d 580 (1983) (holding that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that expressly or implicitly create substantive rights to money damages). In addition, in order to recover under the Tucker Act, Woods must es-

tablish that the relief he seeks constitutes money damages. *See id.* at 216, 103 S.Ct. at 2968 ("The claim must be one for money damages."); *Bowen v. Massachusetts,* 487 U.S. 879, 905, 108 S.Ct. 2722, 2737, 101 L.Ed.2d 749 (1988); *Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 630–31, 34 L.Ed.2d 647 (1973) ("the [Tucker] Act has long been construed as authorizing only actions for money judgments and not suits for equitable relief against the United States"); 14 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3657, at 279 (1985). *But see Neely v. United States,* 546 F.2d 1059, 1064 (3d Cir.1976) (upholding Tucker Act jurisdiction over civil class action to recover wrongfully paid fines without discussing whether repayment of fines constituted money damages or equitable relief).

**24.** We acknowledge that under the FPA, courts imposed restitution as a condition of probation, which was technically considered a *suspension* of the sentence, rather than as an actual part of the sentence itself. *See* 18 U.S.C. § 3651 (repealed as of Nov. 1, 1987) ("[a court] may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such ... conditions as the court deems best").

incarcerated, and if *Hughey* called into question the validity of his imprisonment, that scenario would present us with far stronger considerations in favor of retroactive relief. When liberty is not at stake, the reasons to apply a new decision retroactively, and hence to bend the usual rules of finality, are not necessarily lacking, but are more likely to be missing. *See United States v. Keane*, 852 F.2d 199, 203 (7th Cir.1988).

On a related note, even though we have recognized that restitution can be imposed as a criminal penalty, we have also acknowledged its marked similarity to a civil judgment. As we stated in *United States v. Kress*, 944 F.2d 155 (3d Cir.1991), "when reduced to a judgment, restitution 'does not differ in essence from a judgment arising out of civil proceedings.' In other words, we view[ ] a judgment of restitution as a debt to a victim." *Id.* at 160 (citing *Sleight*, 808 F.2d at 1020). Although there are obvious procedural differences between the creation and enforcement of civil and criminal restitutionary liabilities, a restitutionary obligation, whether civil or criminal, represents essentially the same outcome: a financial debt owed by the defendant.

▇ If as a result of a civil judgment Woods had paid restitution to the Safeguard investors and a subsequent judicial decision had cast serious doubt on the validity of that civil judgment, Woods would not be able to disturb it. Under Rule 60(b), Fed.R.Civ.P., the general rule is that a civil judgment, once final, will not be reopened because of a change in the law. *See generally* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2864, at 223 (1973 & 1992 Supp.) (stating this general rule and collecting cases). *But see Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696, 702 (10th Cir.1989) (allowing the reopening of a civil judgment after a change in law). Given the similarity between Woods' restitution order and a civil judgment, combined with

the general rule of non-retroactivity for civil judgments, we find additional grounds for holding that Woods has not established that he would suffer a complete miscarriage of justice because of *Hughey*'s non-retroactivity. In other words, Woods faces no more injustice than civil defendants who cannot reopen judgments they have been forced to pay despite an intervening change in the law.[25]

As we have mentioned above, we are not presented with a situation, as in *Davis, supra,* or *Osser, supra,* in which there is any question about the legality of the defendant's conviction. As we acknowledged in *Osser*, when a defendant has been convicted of acts that do not lawfully constitute a crime, that situation typifies what is meant by a "complete miscarriage of justice" such that "[n]o circumstances call more for the invocation of a rule of complete retroactivity." 864 F.2d at 1058 (citing *United States v. United States Coin & Currency*, 401 U.S. 715, 724, 91 S.Ct. 1041, 1046, 28 L.Ed.2d 434 (1971)).

Finally, we find in *Osser* further support for our decision to deny Woods the relief he requests. As we have already noted, Woods asks for relief after having completed all facets of his sentence. His appeal, therefore, raises issues very similar to those implicated by coram nobis, which a defendant can only utilize after he or she is no longer in custody. In *Osser*, we denied a request for a writ of coram nobis by a former City Commissioner of Philadelphia who, though no longer incarcerated, sought to vacate his conviction for mail fraud in an effort to recover his city pension. The district court had instructed the jury that it could find Osser guilty of mail fraud if, among other things, it found his acts resulted in the deprivation of the "intangible right" of honest government. Based on the Supreme Court's invalidation of the "intangible rights" theory in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), Osser sought coram nobis relief.

---

**25.** While not a basis for our decision, we have little doubt that had the district court believed it was unable to impose a larger restitutionary condition on its sentence, it would have fixed a longer jail term.

In our decision to deny Osser coram nobis relief because of his failure to challenge the intangible rights theory on direct appeal, we set forth additional considerations, relevant here, that influenced that decision. Specifically, we noted our legal system's heightened interest in finality after a sentence has been served. *See* 864 F.2d at 1059 ("The interest in finality of judgments is a weighty one that may not be casually disregarded. Where sentences have been served, the finality concept is of an overriding nature ...."). We similarly recognized that when a defendant has served a prison sentence and "nothing remains but some financial detriment," there is diminished justification for reopening a defendant's case. *Id.* at 1060. We are more willing to expend scarce judicial resources—which, of course, is what retroactivity entails—on those defendants that come before us because of an ongoing or potential loss of liberty, than on those who, like Woods, seek the retroactive application of a new decision in order to recoup lost money. We emphasize that we find this latter consideration particularly compelling when, as here, the lost money was paid to satisfy a pre-existing civil restitutionary obligation and the government, from whom the defendant seeks repayment of the money, did not retain the funds.

In sum, we hold that *Hughey* should not be retroactively applied to Woods in his Rule 35(a) motion and that the district court's restitution order should, therefore, remain undisturbed.

The order of the district court will be affirmed.