March 30, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 
No. 92-1790

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOHN M. CRONIN,

 Defendant, Appellant.

 

No. 92-1791

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 ROBERT E. STARCK,

 Defendant, Appellant.

 

No. 92-1792

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 NATHANIEL M. MENDELL,

 Defendant, Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]
 

 

 

 Before

 Breyer, Chief Judge,
 

 Aldrich, Senior Circuit Judge,
 

 and Selya, Circuit Judge.
 

 

Annemarie Hassett with whom Federal Defender Office was on brief
 
for appellant John M. Cronin.
Richard C. Driscoll, Jr., with whom Driscoll and Mattingly, P.C.
 
was on brief for appellants Robert E. Starck and Nathaniel M. Mendell.
Mark J. Balthazard, Special Assistant United States Attorney,
 
with whom A. John Pappalardo, United States Attorney, was on brief for
 
appellee.

 

 March 30, 1993
 

 ALDRICH, Senior Circuit Judge. Defendants Cronin,
 

Starck and Mendell were variously convicted on some 15 of a

20 count indictment for mail fraud and inducing interstate

transportation to obtain property by fraud, 18 U.S.C. 1341

and 2314. Cronin was sentenced as an organizer or leader;

Starck and Mendell as managers or supervisors. They appeal,

claiming that the evidence did not warrant findings of guilt,

or, in any event, justify these added characterizations, and

that the orders for restitution were excessive. We affirm,

except as to the last.

 The fraud involved sales of time shares in a

proposed Cape Cod resort, Village Green. Although there were

many subsidiary misrepresentations of consequence, the basic

ones were that Village Green was a sound long-term

investment; that its property, then a motel, would be

renovated for the 1989 season; and that it was a member of

RCI, Resort Condominium International, Inc. Membership in

RCI would permit exchanging time at Village Green for other

resorts, and was a most attractive inducement. In point of

fact Village Green had no financing even sufficient to get

off the ground; initial obligations were not met, and, not

long after the start, foreclosure and bankruptcy were not

only inevitable, but imminent. Second, with respect to

renovation, there was no bona fide prospect of financial

ability to accomplish it. Third, the sales pitch was larded

 -3-

with RCI posters; brochures were offered many customers

(contrary to RCI's instructions), and the sales agreements

recited membership, whereas, in fact, the membership

application was never completed, and was rejected. In sum

total, some $272,000 was collected of which little was

returned, with sales continuing while other protests were

ignored.

 Each defendant denies guilt, or, at the least, says

that the others were more responsible. According to Cronin,

"[T]he prosecution's evidence amounted to nothing more than

mere association between defendant and the sales people (sic)

who made the misrepresentations. . . . The prosecution

presented no substantial evidence that defendant had, or,

more importantly, exercised control over the manner in which

the time shares were sold. . . There was no evidence that

defendant read, reviewed, discussed, or otherwise knew the

contents of the sales documents. . . The evidence was that

the salespeople . . . not defendant, told prospective

purchasers that Village Green was a member of RCI . . .

These salespeople were under the direct and constant

supervision of Hart, the Project Director."

 In point of fact Cronin was the originator of the

development. He had made contact with one Hatfield, who led

him to Starck and Mendell to provide financing. The

financing was never completed, as he knew, and Hatfield told

 -4-

him it was essential. Cronin obtained a sizeable six month

loan at 24% interest annually, subject to endorsement by

Starck and Mendell. He was to receive $400,000 for his

contribution to the development, and was said not to share

with Starck and Mendell as owners because he had had some

difficulty at the Registry of Deeds. He took a note and

third mortgage, which, surely, maintained his interest.

 As to Cronin's innocence of what was going on,

Hart, the Project Director, was partly hired by him, and

reported to him. Cronin, in fact, was in charge of

marketing, and was said to be present every day. He had been

in charge of marketing at an earlier development, and was no

amateur. He could not help but see the RCI posters and

brochures having, in fact, directed the installation of an

RCI room, and he told at least one salesman they were already

a member. (Others said he said it was going through as a

matter of course, which was equally untrue.) The rosy view

painted in his brief is not what we consider. The most that

might be said is that the enterprise may have started on good

intentions, but when that paving ran out it proceeded on the

backs of prone customers.

 We mention briefly Cronin's objection to testimony

that he instructed the contract secretary to place the name

Bernard Cohen on the weekly payroll request at $1,500, at the

same time telling her that Cohen was a dead friend of his.

 -5-

Cronin asserts this to have been irrelevant and highly

prejudicial. Rather, it was highly relevant. In addition to

showing that Cronin was improperly milking the scheme,

contrary to his denial "that money was paid [him]" (payroll

distributions were in cash), it showed the degree to which he

was in charge. The court's finding that relevancy prevailed

over prejudice was well warranted.

 We pause here to say that enough has been shown to

justify the court's finding, with reference to sentence, that

Cronin was an organizer or leader. U.S.S.G. 3B1.1(a).

 Turning to Starck and Mendell, they, as trustees,

were the title owners, and had personally endorsed the

purchase note. The jury found in their favor on some early

counts. They contend, for this and other reasons, that they

did not "devise the scheme." Passing the fact that

defendants can take no comfort from inconsistent verdicts,

Harris v. Rivera, 454 U.S. 339, 345 (1981), it is not
 

necessary that a defendant be an original organizer. United
 

States v. Serrano, 870 F.2d 1, 6 (1st Cir. 1989). On the
 

issue of the RCI alone there were ample incidents to warrant

conscious deceit. On top of this, these defendants could not

have been ignorant of the many financial difficulties that,

in due course, presaged ruin.

 As to the sentencing increase because these

defendants were found to be managers or supervisors, U.S.S.G.

 -6-

 3B1.1(b), Starck and Mendell were, after all, the owners.

We review only for clear error, United States v. Panet-
 

Collazo, 960 F.2d 256, 261 (1st Cir.), cert. denied sub nom.,
 

Diaz v. United States, 113 S.Ct. 220 (1992), and we see none.
 

Manifestly they cannot deny responsibility for deliberate

misrepresentation by salesmen of which they were aware, even

to the point of receiving complaints, simply on the ground

that they were not the ones who devised the procedure. This

would be a happy day for vendors with loose consciences. The

record is replete with misrepresentations, and of

defendants', at least occasional, awareness and lack of

concern.

 With reference to sentences, Starck and Mendell

complain that the court charged them with points for

obstructing justice by committing perjury. Our prior

rejection of this contention, United States v. Batista-
 

Polanco, 927 F.2d 14, 21-22 (1st Cir. 1991), has since been
 

confirmed. United States v. Dunnigan, 122 L. Ed.2d 445
 

(1993).

 Next, defendants complain that their scheme had

commenced prior to the Guidelines. As to the prison

sentences, they were concurrent, and even though mail fraud

counts are separate offenses, see United States v. Lilly, 983
 

F.2d 300 (1st Cir. 1992), there can be no possible

constitutional question. There is a problem, though, with

 -7-

regard to restitution. Although Starck and Mendell state in

their brief that the court ordered restitution for the full

amount obtained, this was not so individually. No defendant

was convicted on all counts, and as to each defendant the

court ordered deducted from the full amount the counts as to

which he had been acquitted. This, however, still charged

him for more than the counts on which he was convicted --

there had been much more collected than was named in the

indictment's 20 counts. The government argued that in

determining the length of sentence it was proper to look at

the entire picture. This is correct, United States v. Fox,
 

889 F.2d 357 (1st Cir. 1989); indeed, even to considering

offenses found by the court though there had been a jury

acquittal. United States v. Mocciola, 891 F.2d 13, 17 (1st
 

Cir. 1989). This, however, is for enhancement of prison

terms within the guidelines. Restitution is a separate

matter. 18 U.S.C. 3663. In United States v. Hughey, 495
 

U.S. 411 (1990), the defendant, charged, in several counts,

with the use of stolen credit cards, pled guilty to the

fraudulent use of one. The order for restitution included

use of others. The Court reversed, saying the outer limit

was "the loss caused by the conduct underlying the offense of

conviction." Id. at 420. This decision, however, did not
 

entirely clear the air, and the circuits have split as to its

application in mail fraud cases.

 -8-

 As of the moment, five circuits have answered, or

appear disposed to answer, that the "offense of conviction"

is the particular mailing charged. See United States v.
 

Pivorotto, No. 92-3207, 1993 U.S. App. LEXIS 2835, at *10,
 

n.5 (3d Cir. Feb. 22, 1993); United States v. Seligsohn, 981
 

F.2d 1418, 1421 (3d Cir. 1992); United States v. Jewett, 978
 

F.2d 248, 252 (6th Cir. 1992); United States v. Streebing,
 

1993 U.S. App. LEXIS 3303, at *18-*24 (6th Cir. Mar. 2,

1993); United States v. Gravatt, 1991 U.S. App. LEXIS 30671,
 

at *10-*14 (6th Cir. Dec. 27, 1991) (rep'd mem., 951 F.2d
 

350); United States v. Sharp, 941 F.2d 811, 814-15 (9th Cir.
 

1991); United States v. Angelica, 951 F.2d 1007, 1009 (9th
 

Cir. 1991); United States v. Wainwright, 938 F.2d 1096, 1097-
 

98 (10th Cir. 1991); United States v. Stone, 948 F.2d 700,
 

703-04 (11th Cir. 1991); see also United States v. Marsh, 932
 

F.2d 710, 712-13 (8th Cir. 1991) (Heaney, J., with the other

two judges concurring in the result). Two circuits have,

however, answered that the offense includes the scheme as a

whole. See United States v. Stouffer, 1993 U.S. App. LEXIS
 

4737, *30-*34 (5th Cir. Mar. 16, 1993) (Garza, J., with whom

Smith, J. concurred; Reavley, J. dissented on this issue);

United States v. Bennett, 943 F.2d 738, 740 (7th Cir. 1991),
 

cert. denied, 112 S. Ct. 2970 (1992); United States v.
 

Brothers, 955 F.2d 493, 497 (7th Cir.), cert. denied, 113 S.
 

Ct. 142 (1992); United States v. Langer, 962 F.2d 592, 600-01
 

 -9-

(7th Cir. 1992); United States v. Turino, 978 F.2d 315, 317-
 

19 (7th Cir. 1992).

 This is a difficult question, and we well

understand the split. Congress, meanwhile, since defendants'

offenses, has amended the statute in favor of broad

restitution.1 Under these circumstances we forego total

analysis, and for the brief pre-amendment period covered by

the present case are content to accept the lenient majority

view. The sentence with respect to restitution must be

limited to the amounts in the counts on which the particular

defendant was found guilty.

 Affirmed, except remanded for correction of orders
 

for restitution in accordance with this opinion.
 

 

1. (2) For the purposes of restitution, a
 victim of an offense that involves as an
 element a scheme, a conspiracy, or a
 pattern of criminal activity means any
 person directly harmed by the defendant's
 criminal conduct in the course of the
 scheme, conspiracy, or pattern.

 3663(a)(2). Added by Pub. L. No. 101-647, 2509, 104
Stat. 4789, 4863 (Crime Control Act of 1990).

 -10-