**UNITED STATES of America, Appellant,**

v.

**Edward James CLARY, Appellee.**

**No. 94–1422.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1994.

Decided Sept. 12, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 20, 1994.

Daniel E. Meuleman, Asst. U.S. Atty., St. Louis, MO (Richard L. Poehling, on the brief), for appellant.

Andrea L. Smith, Asst. Federal Public Defender, East St. Louis, IL, for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, HENLEY and JOHN R. GIBSON, Senior Circuit Judges.

JOHN R. GIBSON, Senior Circuit Judge.

■ The United States appeals from the sentence imposed upon Edward James Clary for possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(b)(1)(A)(iii). Clary entered a guilty plea to the charge which called for a ten-year mandatory minimum sentence. After conducting a four-day hearing, the district court sentenced Clary to four years. The court held that the 100 to 1 ratio for crack cocaine to powder cocaine was disproportionate and in violation of the Equal Protection Clause both generally and as applied, and that the selective prosecution of crack cases on the basis of race was constitutionally impermissible as applied to Clary. The United States essentially argues that these issues have been repeatedly decided and there was no equal protection violation or selective prosecution of Clary. We reverse and remand for resentencing in accord with the applicable statutes and guidelines.

After Clary's guilty plea but before sentencing, he filed a motion arguing that the ten-year mandatory minimum sentence contained in the crack cocaine statute, 21 U.S.C. § 841(b)(A)(iii), and United States Sentencing Guideline section 2D1.1, violated his Equal Protection rights guaranteed by the Fifth Amendment.[1] Clary presented eleven

---

1. Section 841(b)(1)(A)(iii) provides for a ten-year minimum sentence for those persons found possessing 50 grams or more of cocaine base. A similar ten-year minimum is imposed for those possessing over 5,000 grams of powder cocaine.

The Sentencing Commission adopted the 100 to 1 ratio in U.S.S.G. § 2D1.1. Accordingly, the district court treated Clary's challenges to section 841 and guideline section 2D1.1 as one and the same. We do likewise.

witnesses who testified about the profound impact of the crack statute and its ten year mandatory minimum sentence on African Americans. The district court determined that in spite of earlier decisions from this court stating that the differentiation between the treatment of powder cocaine and crack cocaine was constitutional and did not violate the Equal Protection Clause, we invited arguments presenting new facts and legal analysis in *United States v. Marshall,* 998 F.2d 634, 635 n. 2 (8th Cir.1993).

The district court began its factual analysis by examining the role that racism has played in criminal punishment in this country since the late seventeenth century. *United States v. Clary,* 846 F.Supp. 768, 774–782 (E.D.Mo. 1994). The district court touched on such recent events as the turmoil of the 1960's and the "cataclysmic economic change" in the 1980's. *Id.* at 777–78. The court also examined unemployment levels, which the court concluded impacted African Americans more than the general population. *Id.* at 777. According to the court, African Americans' anger and frustration led to increased drug traffic and associated violence. *Id.* at 777–78.

The district court also discussed the unconscious predisposition of legislators, and reasoned that although overt racial animus may not have led to Congress' enactment of the crack statute, its failure to account for a substantial and foreseeable disparate impact would violate the spirit and letter of equal protection. *Id.* at 782. Accordingly, it concluded that the statute should be reviewed under strict scrutiny and the rules announced in *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). The court listed the seven factors outlined by *Arlington* as circumstantial evidence of a racially-discriminatory legislative purpose. The factors are: (1) adverse racial impact, (2) historical background, (3) specific sequence of events leading up to the decision, (4) departure from normal procedure sequence, (5) substantive departure from routine decision, (6) contemporary statements made by decisionmakers, and (7) the inevita-

bility or foreseeability of the consequence of the law. 846 F.Supp. at 783.

The court outlined the events leading up to passage of the crack statute. The court cited several news articles submitted by members of Congress for publication in the *Congressional Record* which portrayed crack dealers as unemployed, gang-affiliated, gun-toting, young black males. *Id.* at 783–84. Legislators, the court reasoned, used these media accounts as informational support for the statute. The district court also pointed to perceived procedural irregularities surrounding Congress' approval of the crack sentencing provisions. *Id.* at 784–85. For instance, few hearings were held in the House on the enhanced penalties for crack. *Id.* at 785. While many Senators called for a more measured response, the Senate committee conducted a single morning hearing. *Id.* at 784–85. Finally, although the penalties were originally set at 50 to 1, they were arbitrarily doubled. *Id.* at 784.

The district court also observed that 98.2 percent of defendants convicted of crack cocaine charges in the Eastern District of Missouri between the years 1988 and 1992 were African American. *Id.* at 786. Nationally, 92.6 percent of those convicted of crack cocaine charges were African American, as opposed to 4.7 percent who were white. 786. With respect to powder cocaine, the percentages were largely reversed. *Id.* The court found that this statistical evidence demonstrated both the disparate impact of the 100 to 1 ratio and the probability that "the subliminal influence of unconscious racism ha[d] permeated federal prosecution throughout the nation." *Id.* at 791.

While the government directed the court to evidence that Congress considered crack to be more dangerous because of its potency, addictiveness, affordability and prevalence, the court found evidence in the record contradicting many of the legislators' beliefs. *Id.* at 781–92. In particular, the court questioned Congress' conclusion that crack was 100 times more potent or dangerous than powder cocaine, referring to testimony that there is no reliable medical evidence that crack cocaine is more addictive than powder cocaine. *Id.* In light of these factors, the

court found the punishment of crack at 100 times greater than powder cocaine to be a "frenzied, irrational response." *Id.* at 792. The court repeatedly stressed that "cocaine is cocaine." *Id.* at 793.

The district court held the portions of 21 U.S.C. section 841 mandating punishment 100 times greater for crack than powder cocaine to be constitutionally invalid generally and as applied in this case.

We believe that this case could well be decided on the basis of past decisions by this court. *See United States v. Maxwell,* 25 F.3d 1389, 1396–97 (8th Cir.1994); *United States v. Simms,* 18 F.3d 588, 595 (8th Cir. 1994); *United States v. Parris,* 17 F.3d 227, 230 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994); *United States v. Johnson,* 12 F.3d 760, 763–64 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 821 (1994); *United States v. Echols,* 2 F.3d 849, 850 (8th Cir.1993); *United States v. Womack,* 985 F.2d 395, 400 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 276, 126 L.Ed.2d 227 (1993); *United States v. Williams,* 982 F.2d 1209, 1213 (8th Cir.1992); *United States v. Lattimore,* 974 F.2d 971, 974–76 (8th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *United States v. Willis,* 967 F.2d 1220, 1225 (8th Cir.1992); *United States v. Simmons,* 964 F.2d 763, 767 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992); *United States v. Hechavarria,* 960 F.2d 736, 738 (8th Cir.1992) (per curiam); *United States v. McDile,* 946 F.2d 1330, 1331 (8th Cir.1991); *United States v. Johnson,* 944 F.2d 396, 409 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991); *United States v. House,* 939 F.2d 659, 664 (8th Cir. 1991); *United States v. Winfrey,* 900 F.2d 1225, 1226–27 (8th Cir.1990); *United States v. Reed,* 897 F.2d 351, 352–53 (8th Cir.1990) (per curiam); *United States v. Buckner,* 894 F.2d 975, 978–80 (8th Cir.1990).

In *Lattimore,* Chief Judge Arnold carefully examined earlier authority holding that Congress clearly had rational motives for creating the distinction between crack and powder cocaine. 974 F.2d at 974–75. Among the reasons were "the potency of the drug, the ease with which drug dealers can carry and conceal it, the highly addictive nature of the drug, and the violence which often accompanies trade in it." *Id.* at 975. *Lattimore* squarely rejects the argument that crack cocaine sentences disparately impact on African Americans. *Id.* Citing *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), we observed that even if a neutral law has a disproportionate adverse impact on a racial minority, it is unconstitutional only if that effect can be traced to a discriminatory purpose. *Lattimore,* 974 F.2d at 975. Discriminatory purpose "implies that the decisionmaker, in this case [Congress], selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296). We concluded that there was no evidence that Congress or the Sentencing Commission had a racially discriminatory motive when it crafted the Guidelines with extended sentences for crack cocaine felonies. *Lattimore,* 974 F.2d at 975.

*Lattimore* also referred to *Buckner,* 894 F.2d 975, a case dealing with a substantive due process challenge to the 100 to 1 ratio. In *Buckner,* we held that requiring more severe penalties for crack than cocaine powder was not arbitrary or irrational. *Id.* at 980. We referred to the Senate hearing on crack, citing statements by five Senators on the dangers of crack cocaine. *Id.* at 978–79 n. 9 (citing *"Crack" Cocaine: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Government Affairs,* 99th Cong., 2d. Sess. 20 (1986)). *Buckner* also discussed the testimony before Congress of Dr. Robert Byck, Professor of Psychiatry and Pharmacology at Yale University, who contrasted inhaling crack vapor to packing a nose with cocaine powder (the most common form of using cocaine powder). *Id.* Byck stated that crack is more dangerous than cocaine powder because as a person breathes crack vapor, an almost unlimited amount of the drug can enter the body. *Id.* "Moreover, the speed of the material going to the brain is very rapid." *Id.* He also commented on the marketability of crack cocaine,

stating that "[h]ere suddenly, we have cocaine available in a little package, in unit dosage, available at a price that kids can pay initially." *Id.*

Similarly, in *Maxwell,* we rejected a strict scrutiny argument that was based on the continued enforcement of the statute rather than its enactment. 25 F.3d at 1396–97. We referred to *Lattimore* and *Feeney,* and held that the defendants had presented no evidence that Congress or the Sentencing Commission had "permitted the challenged provisions to remain in effect 'at least in part because of, not merely in spite of, their adverse effects upon' a racial minority." *Maxwell,* 25 F.3d at 1397 (*quoting Johnson,* 12 F.3d at 763–64).

█ The district court's painstakingly-crafted opinion demonstrates the careful consideration it gave not only to the testimony before it, but also to the voluminous documents introduced by Clary, including both law review and text materials. This case undoubtedly presents the most complete record on this issue to come before this court. Nevertheless, we are satisfied that both the record before the district court and the district court's findings fall short of establishing that Congress acted with a discriminatory purpose in enacting the statute, and that Congress selected or reaffirmed a particular course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Lattimore,* 974 F.2d at 975 (quoting *Feeney* ), 442 U.S. at 279, 99 S.Ct. at 2296. While impact is an important starting point, *Arlington Heights* made clear that impact alone is not determinative absent a pattern as stark as that in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), or *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). 429 U.S. at 266, 97 S.Ct. at 564.

We first question the district court's reliance on "unconscious racism." 846 F.Supp. at 778–782. The court reasoned that a focus on purposeful discrimination will not show more subtle and deeply-buried forms of racism. *Id.* at 781. The court's reasoning, however, simply does not address the question whether Congress acted with a discriminatory purpose. Similar failings affect the

court's statement that although intent per se may not have entered into Congress' enactment of the crack statutes, Congress' failure to account for a substantial and foreseeable disparate impact on African Americans nonetheless violates the spirit and letter of equal protection.

We also question the court's reliance on media-created stereotypes of crack dealers and its conclusion that this information "undoubtedly served as the touchstone that influenced racial perceptions held by legislators and the public as related to the 'crack epidemic.'" *Id.* at 784. Although the placement of newspaper and magazine articles in the *Congressional Record* indicates that this information may have affected at least some legislators, these articles hardly demonstrate that the stereotypical images "undoubtedly" influenced the legislators' racial perceptions. It is too long a leap from newspaper and magazine articles to an inference that Congress enacted the crack statute because of its adverse effect on African American males, instead of the stated purpose of responding to the serious impact of a rapidly-developing and particularly-dangerous form of drug use. Similarly, the evidence of the haste with which Congress acted and the action it took is as easily explained by the seriousness of the perceived problem as by racial animus.

The district court's final conclusion that objective evidence supports the belief that racial animus was a motivating factor in enacting the crack statute further belies the weakness of its position. A belief that racial animus was a motivating factor, based on disproportionate impact, is simply not enough since the Equal Protection Clause is violated "only if that impact can be traced to a discriminatory purpose." *Feeney,* 442 U.S. at 272, 99 S.Ct. at 2293. The chain of reasoning of the district court simply will not support a conclusion or a finding that the crack statutes were passed "because of, not merely in spite of" the adverse effect upon an identifiable group. *Id.* at 279, 99 S.Ct. at 2296.

Other testimony before the district court demonstrates the particular lack of support for the court's conclusion about Congress' motivation in passing the statute. The testi-

mony of Eric E. Sterling, Counsel to the Subcommittee of Criminal Justice of the House of Representatives at the time the statutes in question were passed, is the most pertinent. Sterling stated that the members of Congress did not have racial animus, but rather "racial consciousness," an awareness that the "problem in the inner cities ... was about to explode into the white part of the country." Sterling believed that Congress wanted the penalties to be applied wherever crack was being trafficked, although Congress was aware that crack was used primarily by minorities. He further described the seriousness of the problem as reported by the popular press, and stated his view that the creation and promulgation of the law was based on "crass political interest." His opinion was that the motivating factor for the legislation was a perception that crack cocaine posed a unique and unprecedented problem for American narcotics enforcement. Similarly, David Courtwright, who described himself as an historian of drug laws, stated that he did not know if racial considerations led to the passage of the crack laws, and that he had no special or expert knowledge as to the motives of the legislators voting for the 1986 law.

For the most part, the other witnesses that testified before the district court were medical witnesses, several of whom contested the medical information before the Senate that showed differences between crack and powder cocaine. Scientific disagreement with testimony in congressional hearings, offered at a later time and after additional research, simply does not establish discriminatory purpose, or for that matter, a lack of scientific support for Congress' action.

■ The district court also found it "likely ... that the subliminal influence of unconscious racism has permeated federal prosecution throughout the nation." 846 F.Supp. at 791. Clary concedes he "did not claim below that he was selectively prosecuted because of his race ... [because he] was mindful of the even more difficult burden of proof he would have had to carry." Appellees's Brief at 43. To prevail on such a claim, a defendant "must establish that the decision to bring the federal charges against him, and not against others who committed federal crack violations and thus were similarly situated, itself had a racially discriminatory effect." *United States v. Brown,* 9 F.3d 1374, 1376 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1568, 128 L.Ed.2d 213 (1994). Even more to the point, Clary presented only statistical evidence and offered nothing else to show selective prosecution. As we held in *Brown,* this is simply not enough. *Id.*

We reverse and remand to the district court for resentencing consistent with this opinion.