**UNITED STATES of America**

v.

**Andre Lonzell BURROUGHS.**

Crim. No. 90–264–01.
Civ. No. 95–1360.

United States District Court,
E.D. Pennsylvania.

Aug. 21, 1995.

Timothy Rice, Asst. U.S. Atty., for U.S.

David McColgin, Defender Association, Philadelphia, PA, for Burroughs.

## MEMORANDUM

CAHN, Chief Judge.

Currently before the court is a petition by Andre Lonzell Burroughs to have his sentence modified pursuant to 28 U.S.C. § 2255.[1] For the reasons that follow, Burroughs' request for relief must be denied.

## I. BACKGROUND

On August 24, 1990, a jury convicted Burroughs of distributing and conspiring to distribute cocaine base, or "crack cocaine," [2] in violation of 21 U.S.C. §§ 841(a)(1) & 846. The court sentenced Burroughs to ten years imprisonment pursuant to 21 U.S.C. § 841(b)(1) and U.S.S.G. §§ 2D1.1(d)(4) & 5G1.1(b).

---

1. Section 2255 in pertinent part provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the minimum allowed by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.

2. The United States Sentencing Guidelines (the "Sentencing Guidelines") define cocaine base as "crack ... the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1, Drug Quantity Table, footnote. The court uses the terms "cocaine base" and "crack cocaine" interchangeably in this memorandum to distinguish this form of cocaine from cocaine powder.

Burroughs now argues that the pertinent sections of 21 U.S.C. § 841 and the Sentencing Guidelines which provide the penalties for crack cocaine (collectively the "cocaine sentencing scheme") violate the equal protection of the laws under the Fifth Amendment because they penalize activity involving a given quantity of crack cocaine much more severely than activity involving the same quantity of cocaine powder.[3] In making this argument[4], Burroughs relies on *United States v. Clary,* 846 F.Supp. 768 (E.D.Mo.), *rev'd,* 34 F.3d 709 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1172, 130 L.Ed.2d 1126 (1995), in which a district court in the Eighth Circuit held that the cocaine sentencing scheme implicates and fails strict scrutiny under equal protection analysis because it unfairly discriminates against black males. At the invitation of the court, the National Association for the Advancement of Colored People ("NAACP") filed an amicus brief. The NAACP argues that the United States Sentencing Commission's recent report and proposed amendments to the cocaine sentencing scheme contradict the factual basis of the Third Circuit's equal protection analysis in *United States v. Jones,* 979 F.2d 317 (3d Cir.1992), and reveal that the sentencing scheme fails rational review.

## II. DISCUSSION

### A. The statutory distinction

With the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986), Congress created the basic statutory framework of mandatory minimum penalties that currently apply to federal drug trafficking offenses. Congress amended 21 U.S.C. § 841 to provide for a 100:1 ratio in the quantities of cocaine powder and crack cocaine that trigger mandatory minimums. In other words, an offender must distribute 100 times as much cocaine powder as a similar crack offender to receive the same base sentences. 21 U.S.C. § 841(b)(1)(A) mandates a ten-year term of imprisonment for offenses involving 5000 grams of cocaine powder or only 50 grams of cocaine base. Similarly, 21 U.S.C. § 841(b)(1)(B) mandates a five-year term of imprisonment for offenses involving 500 grams of cocaine powder or 5 grams of cocaine base. The United States Sentencing Commission utilized these mandatory minimum penalties as reference points in deriving Sentencing Guidelines which, consequently, employ the same 100:1 ratio. For example, trafficking in 5000 grams of powder cocaine or 50 grams of cocaine base is assigned offense level 32, a level corresponding to a guideline range of 121–151 months for a defendant in Criminal History Category I. *See* U.S.S.G. § 2D1.1.

The 100:1 ratio between cocaine powder and crack cocaine inherent in the cocaine sentencing scheme has a profound effect on the sentences imposed upon defendants. The instant case is illustrative. Burroughs distributed and conspired to distribute 141.9

---

3. Although the Fifth Amendment does not contain an Equal Protection Clause, the Supreme Court has held that actions taken by the federal government violate the Due Process Clause of the Fifth Amendment if the same action would offend the Equal Protection Clause of the Fourteenth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954).

4. Burroughs did not raise this § 2255 claim at trial or on direct appeal. Accordingly, even if the court were to agree with Burroughs on the merits, he would need to "show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982). Had this court found the crack cocaine statutes unconstitutional, it would have sentenced Burroughs to a term of incarceration of only 21–27 months. *See infra.* Thus, the unconstitutionality of the crack statutes clearly would have prejudiced the outcome of his trial. Because this particular constitutional question was, like the crack provisions themselves, very much in its infancy in 1990, the court also would be inclined to excuse Burroughs' procedural default.

Because retroactivity appears to be a dispositive, threshold question, *see Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion); *United States v. Woods,* 986 F.2d 669, 674 n. 6 (3d Cir.1993), the court also notes that it would retroactively apply collateral relief in this case upon establishing a new rule of criminal law that the crack statutes are unconstitutional. The several years of incarceration that are at stake weigh heavily in favor of retroactive relief. *See id.* at 680–81.

grams of crack cocaine. He was therefore subject to a minimum of ten years imprisonment under 21 U.S.C. §§ 841(b)(1)(A) and 846, and, with a two point reduction for acceptance of responsibility, 97–121 months imprisonment under the Sentencing Guidelines. Accordingly, the Guidelines required a sentencing range of 120–121 months. *Id.* at 5G1.1(b). In contrast, had Burroughs trafficked a like amount of cocaine *powder,* and assuming the same two point reduction for acceptance of responsibility, he would have been subject to a term of imprisonment of only 21–27 months.

## B. Equal protection analysis

### 1. Strict scrutiny

■■■ The equal protection component of the Fifth Amendment Due Process Clause commands that similarly situated people must be treated alike. Judicial review under equal protection is conducted under different levels of scrutiny depending upon the nature of the alleged violation. If it is demonstrated that a legislature passed a law with a discriminatory purpose, the court must review the challenged legislation under the demanding "strict scrutiny" standard. *See Rogers v. Lodge,* 458 U.S. 613, 617 n. 5, 102 S.Ct. 3272, 3275 n. 5, 73 L.Ed.2d 1012 (1982). In such cases, the government must prove that the legislative classification is narrowly tailored to achieve a compelling government interest. *Miller v. Johnson,* — U.S. —, —, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995).

In *United States v. Frazier,* 981 F.2d 92 (3d Cir.1992), the Court of Appeals for the Third Circuit squarely rejected the notion that discriminatory intent led to the passage of the powder/base distinction in the cocaine sentencing scheme. Although it acknowledged that even facially neutral statutes might disguise invidious racial classifications, the court found "that there is no evidence whatsoever that suggests that the distinction

drawn between cocaine base and cocaine was motivated by any racial animus or discriminatory intent on the part of either Congress or the Sentencing Commission." *Id.* at 95. Strict scrutiny, therefore, was not warranted. *Id.*

Burroughs asks this court to consider *United States v. Clary,* 846 F.Supp. 768 (E.D.Mo.1994). In *Clary,* the district court responded to the Supreme Court's warning that the possibility of racial discrimination "demands a sensitive inquiry into such circumstantial evidence of intent as may be available." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).[5]

The court proceeded to provide an insightful analysis of the historical background and the contemporaneous sequence of events and congressional statements leading up to the passage of the cocaine sentencing scheme, as well as the racial impact of the scheme. The court found, *inter alia:*

(1) a history of racism inherent in America's attempt to control crime, *Clary,* 846 F.Supp. at 774–78;

(2) the existence of "unconscious racism," culminating from centuries of overt racism and our minds' subsequent attempts to suppress the racist ideals, and enabling a benign neglect for the harmful impact that legislative decisions might have upon the black community, *Id.* at 778–82; *see also* Lawrence, C.III, *The Id, The Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stanford L.Rev. 317 (1987);

(3) a congressional record replete with stereotyping media and testimonial accounts which emphasized that the "'crack problem' was a 'black problem' that needed to be isolated and prevented from 'spreading' to white suburban areas," *Clary,* 846 F.Supp. at 783–85; *see, e.g.* 132 Cong.Rec. S4668 (daily

---

5. In this regard, a court may consider (1) any adverse racial impact of the official action, *id.,* (2) the historical background of the decision, *id.* at 267, 97 S.Ct. at 564–65, (3) the specific sequence of events leading up to the decision, *id.,* (4) departures from the normal procedural sequence, *id.,* (5) substantive departure from routine decisions, *id.,* (6) contemporaneous state-

ments made by the decision makers, *Washington v. Davis,* 426 U.S. 229, 252, 96 S.Ct. 2040, 2053–54, 48 L.Ed.2d 597 (1976), and (7) the inevitability or foreseeability of the consequence of the decision, *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 266, 99 S.Ct. 2282, 2289, 60 L.Ed.2d 870 (1979).

ed. April 22, 1986) ("Less than a block from where unsuspecting white retirees play tennis, gangs of young black men push their rocks on passing motorists, interested or not");

(4) a "frenzied" Congress that departed from normal procedures in its haste to pass the legislation, *Clary*, 846 F.Supp. at 783–85; *see* 132 Cong.Rec. S13748 (remarks of Sen. Evans) ("at times the action [in the House] resembled a Congressional lynch mob more than it did careful legislation");

(5) a starkly disparate impact of the legislation upon African–Americans. *Clary*, 846 F.Supp. at 786. The United States Sentencing Commission recently reported that, in fiscal 1993, 88.3 percent of the defendants convicted nationally of federal crack cocaine violations were black, and 4.1 percent of the defendants were white. In contrast, 32 percent of those convicted for powder cocaine violations were white, and 27.4 were black.[6] United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* 161 (Feb.1995).

Because of these findings, the district court applied strict scrutiny to the cocaine sentencing scheme. Under this highest level of scrutiny, the court found that the sentencing scheme violated equal protection both generally and as applied in that case. *Clary*, 846 F.Supp. at 791–97. The Court of Appeals for the Eighth Circuit subsequently reversed the district court. *United States v. Clary*, 34 F.3d 709 (8th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1172, 130 L.Ed.2d 1126 (1995).

The evidence discussed by the district court in *Clary* is alarming. As the Court of Appeals for the Second Circuit commented, it "raises the judicial eyebrow." *United States v. Moore*, 54 F.3d 92, 98 (2d Cir.1995). It does not, however, warrant a departure from *Frazier's* conclusion that strict scrutiny is not implicated.

The evidence falls short of demonstrating that Congress chose to penalize crack cocaine more harshly than cocaine powder "at least in part 'because of,' not merely 'in spite of' its adverse effects upon African–Americans." *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. The discriminatory impact of the classification in question is great. However, this impact alone does not present a pattern so stark that no conclusion other than discriminatory intent is viable. *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (altering of city boundaries from square to a 28–sided figure so as to exclude at least 395 of 400 black voters without excluding a single white voter raises inference of discriminatory intent); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (where all but one of the white applicants for permit to resume laundry operations received permits while none of the more than 200 Chinese applicants were successful, an inference of discriminatory intent arises). Moreover, an alternative, racially neutral conclusion is readily apparent. As the court will discuss *infra*, Congress believed that crack cocaine is in several respects a more dangerous drug than cocaine powder.

Much of the other evidence cited in *Clary* spells out in black and white the fact that legislators spent little time considering legislation that they knew would severely impact African–Americans. However, "even conscious awareness on the part of the legislature that the law will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role in the passage of the statute." *Frazier*, 981 F.2d 92 (citing *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296). Even set against the historical backdrop of racism in the criminal justice system, there simply is insufficient evidence to conclude that race caused Congress to act in this case.[7]

---

**6.** The court found further reason for skepticism in the law enforcement discretion involved in prosecuting crack cocaine cases. *Id.* at 787–791. Among people who have used crack, the number of whites more than doubles the number of blacks. National Institute on Drug Abuse, *National Household Survey on Drug Abuse* 38–39 (Nov. 20, 1992).

**7.** Perhaps the best evidence of causation involves unconscious racism. Like the district court in *Clary* and many commentators on the cocaine sentencing scheme, this court believes that the 100:1 ratio would not have evolved if crack cocaine activity had been perceived as central to white suburbia rather than the black, inner city. *Clary* presents a compelling argument that un-

This same conclusion has been reached not only in *Frazier* but also by every circuit court that has addressed the issue, both before and after *Clary*. *See, e.g., Moore,* 54 F.3d at 99; *United States v. Galloway,* 951 F.2d 64, 65–66 (5th Cir.1992). *See also* United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* 192 (Feb.1995) (research conducted by Commission does not support finding of racial animus); *United States v. Walls,* 841 F.Supp. 24, 27–31 (D.D.C.1994) (concluding after a careful examination of the legislative history that "[t]he racial implications of the legislative history of the [statute] are too sparse, too tangential or too remote in time to support a finding that a majority in Congress in 1986 intended the crack penalties to discriminate against blacks").

Most important, the Court of Appeals for the Third Circuit has very recently cited *Frazier* with approval. In *United States v. Alton,* 60 F.3d 1065 (3d Cir.1995), the Court of Appeals reversed the district court's decision to depart downward from the Sentencing Guidelines in light of the disparate impact that the Guidelines visit upon African–Americans and the arbitrariness of the Guidelines distinction. In rejecting this latter argument, the appellate court recited its finding in *Frazier* that there is no evidence of discriminatory intent. *Id.,* 60 F.3d at 1068–69. Although the court did not address the arguments raised in *Clary,* this conclusion remains binding precedent in this circuit.

### 2. Rational review

■ The crack cocaine statutes are thus subject to the lowest level of constitutional scrutiny, rational basis review. Under this test, legislatures are afforded great deference "and legislative classifications are valid unless they bear no rational relationship to a permissible [government] objective." *Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979). Moreover, "Congress need not explicitly state its

reasons for passing legislation so long as the courts can find its rational purpose." *United States v. Jones,* 979 F.2d 317, 319 (3d Cir. 1992) (citing *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)).

In *United States v. Jones,* 979 F.2d 317 (3d Cir.1992), the Court of Appeals for the Third Circuit rejected the defendant's equal protection claim that there was no rational basis for distinguishing between cocaine powder and cocaine base. It found that crack cocaine is chemically different, cheaper to manufacture and purchase, and more powerful and addictive than cocaine powder. *Id.* at 319. In short, the court found that crack cocaine is "a different drug from cocaine [powder]" and that "Congress responded by treating it differently in the law." *Id.*

The NAACP argues that this factual predicate employed in *Jones* has been rejected by the Sentencing Commission. "Lacking that predicate, the law loses its rational basis and cannot pass constitutional scrutiny." Brief *Amicus Curiae* of the National Association for the Advancement of Colored People at 10 [hereinafter *Amicus Brief*].

In September 1994, as part of the Violent Crime Control and Law Enforcement Act of 1994, Congress directed the Sentencing Commission to "submit a report to Congress on ... the differences in penalty levels that apply to different forms of cocaine and include any recommendations that the Commission may have for retention or modification of such differences in penalty levels." 108 Stat. 2097 (1994).

Early in 1995 the Sentencing Commission submitted a report to Congress detailing the Commission's research into the differences in penalty levels that apply to crack and powder cocaine offenses: United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (1995) [hereinafter *Special Report*]. Recently, the Commission also proposed to Congress amendments to the Sentencing Guide-

---

conscious racism might allow an otherwise race-friendly legislative body to pass a law with a foreseeable and harsh impact upon African–Americans. However, as the Court of Appeals in *Clary* responded, this reasoning "does not address the question

whether Congress acted with a discriminatory purpose." *Clary,* 34 F.3d at 709. In other words, current equal protection analysis focuses only on the *conscious* reasoning of law-makers; it simply does not evaluate subconscious legislative motives.

lines as well as changes in the statutory mandatory minimum penalties. *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines for United States Courts*, 60 Fed.Reg. 25074 (1995) [hereinafter *Guideline Amendments* ]; United States Sentencing Commission, *Materials Concerning Sentencing for Crack Cocaine Offenses* 57 CrL 2127 (May 31, 1995) [hereinafter *Sentencing Materials* ]. Based on the factual information gathered in the *Special Report,* these proposals would "equalize sentences for offenses involving similar amounts of crack cocaine and powder cocaine at the level currently provided for powder cocaine." *Guideline Amendments,* 60 Fed.Reg. at 25076.

▪ Thus, the Sentencing Commission has concluded that crack cocaine offenses should be punished no more harshly than powder cocaine offenses. The NAACP correctly argues that "[a]lthough the Commission's proposed amendments ... cannot be given judicial effect until they become law, the evidence on which the Commission based its legal conclusions is relevant now." *Amicus Brief* at 4.[8]

The Sentencing Commission found that "the congressional decision to treat powder and crack cocaine differently arose primarily from members' beliefs that crack cocaine was significantly more dangerous than powder cocaine." *Special Report* at 180. Motivating this belief were the following reasons: (1) crack cocaine was viewed as extraordinarily addictive; (2) Congress believed there was a higher correlation between crack cocaine use and the commission of other serious crime; (3) the physiological effects of crack cocaine were seen as leading to higher rates of psychosis and death; (4) Congress believed that young people were especially prone to crack cocaine use; and (5) "Congress believed that crack cocaine's purity and potency, relatively low cost, ease of manufacture, transportation, disposal, and consumption were leading to widespread use." *Id.* at 180–81.

The Commission explored the accuracy of these views. It first explained that crack cocaine is derived from cocaine powder. Cocaine powder is dissolved in a solution of sodium bicarbonate and water; this solution is then boiled, and the solid substance which results is allowed to dry. *Special Report* at 14.

The Commission found "that there is a greater likelihood of addiction resulting from the casual use of crack cocaine than from the casual use of powder cocaine." *Id.* at 181.[9] Both crack cocaine and cocaine powder produce the same type of physiological and psychotropic effects. However, the injection of cocaine powder and the inhalation (smoking) of crack cocaine are absorbed more quickly by the body than the insufflation (snorting) of cocaine powder, thus leading to a greater intensity and shorter duration of the psychotropic effects. This in turn leads to a greater likelihood of dependence and abuse. *Id.* at 22–30, 182. Because only a small percentage of the users of cocaine powder inject the drug, powder cocaine use is perceived as being, on average, safer than snorting crack cocaine. *Id.* at 35, 182–83.

The Commission further found that "while most cocaine-related emergency room admissions result from smoking crack, most cocaine-related deaths result from injection of powder." *Id.* at 184. It found that the sparse data available suggests that those operating in crack cocaine—its marketing and distribution—are more prone to increased levels of criminal activity, including violence and weapon possession. *Id.* at 184–86. However, it found no evidence that the *use* of crack cocaine alters a person's behavior to make that person more likely than those who

8. The proposed amendments to the Sentencing Guidelines become effective on November 1, 1995 unless Congress repeals them beforehand. *Guideline Amendments,* 60 Fed.Reg. at 25074. The proposed legislation, which "is intended to harmonize the penalty statutes with the guideline amendments," *Sentencing Materials,* 57 CrL at 2127, must be separately adopted by Congress to become effective. In the event that (1) the Sentencing Commission decides, in a vote scheduled for this September, that the amendments should apply retroactively and (2) both proposals become effective, Burroughs may move anew for the court to modify his sentence.

9. Many of the court's citations in this section are to conclusions and recommendations in Chapter Eight of the *Special Report.* Fuller discussions can be found in Chapters One through Seven.

use cocaine powder to commit a crime. *Id.* at 197. Finally, the Commission found that crack can be easily manufactured, without major trafficking efforts, and that "the ease by which crack can be administered and its ability to be marketed cheaply have made it particularly appealing and accessible to a broader population, including . . . the poor and the young." *Id.* at 188–89, 195.

In light of this empirical information, which was largely unavailable when Congress adopted the cocaine statutes, the Sentencing Commission reassessed the 100:1 quantity ratio between cocaine powder and crack cocaine and recommended that the ratio be equalized to 1:1. The Commission found that many of the harms associated with crack cocaine are already accounted for by the current Sentencing Guidelines. For example, although "crack cocaine offenders generally have more extensive criminal records . . . [t]he current guidelines already properly provide for enhanced penalties for those with greater criminal histories as well as very severe sentences for career offenders and armed criminals." *Sentencing Materials,* 57 CrL at 2129. Moreover, the Commission has proposed a number of amendments to the Guidelines that specifically address other aggravating factors associated with some, but not all, crack cocaine offenses. "These amendments provide for considerably higher sentences for the use of a firearm during a drug offense, the involvement of assault and other prohibited weapons, the involvement of criminal street gangs in drug offenses, drive-by shootings, and the use of juveniles in the commission of offenses." *Id.*

Furthermore, while acknowledging that it has long differentiated between drug types as a basis for its recommended penalties, the Commission was moved by "six inescapable facts":

First the Commission's guidelines provide for severe punishment for those trafficking in powder cocaine. There have been few if any complaints about the leniency of these guidelines. Second, powder and crack co-caine have the same active ingredient—the cocaine alkaloid—and both produce the same type of physiological and psychological effects. Third, while smoking crack cocaine can lead to addiction in a greater number of cases than can snorting powder, injecting powder cocaine is as dangerous as or more dangerous than smoking crack. In light of the fact that crack cocaine can be easily produced from powder cocaine, the form of cocaine is simply not a reasonable proxy for dangerousness associated with use. Fourth, any quantity ratio greater than equivalency will lead to the unfair result that more sophisticated, higher-level powder distributors will be sentenced relatively less severely than some of the retailers they supply. Fifth, the present system results in obvious punishment inequities by providing the same penalty for 500 grams of powder (½ kilo)— yielding between 1,000 and 5,000 doses and costing up to $75,000—as for five grams of crack cocaine yielding between 10 and 50 doses and costing up to $750. And sixth, any quantity ratio higher than equivalency will impact almost entirely on minority defendants.

*Id.* at 2130.[10]

The conclusions and recommendations of the Sentencing Commission sounded a sharp retreat from current cocaine sentencing policy. However, the court cannot agree with the NAACP that they "contradict every factual assumption relied on by the Third Circuit in *Jones.*" *Amicus Brief* at 7.

The NAACP argues that the *Jones* court's assumption that crack cocaine is a different drug than cocaine powder has been contradicted by the Sentencing Commission. It points to the Commission's summary that "[c]rack and powder cocaine are pharmacologically the same drug." *Guideline Amendments,* 60 Fed.Reg. at 25077. This statement, however, does not contradict *Jones.* The Sentencing Commission apparently reached this conclusion because it found that

---

**10.** "Nor does the fact that crack is typically sold in small amounts, which may make it more readily available among lower-income groups, justify increased punishment compared to a form of the drug that is more commonly sold in amounts available only to the affluent. The Commission does not believe that longer punishment can be justified solely because a particular form of a drug is more likely to be used by a disadvantaged population." *Id.*

all forms of cocaine have the same active ingredient—cocaine alkaloid—and produce the same type of physiological and psychotropic effects. *See Special Report* at 12, 14. However, the Commission made no findings which contradict the finding in *Jones* that crack cocaine and cocaine powder have different chemical compositions. The Commission explained that in cocaine base "the cocaine alkaloid has been 'freed' from the salt substrate" found in cocaine powder, and that "it vaporizes at a significantly lower temperature than powder cocaine." *Id.* at 13. The finding by the *Jones* court that crack cocaine is a different drug than cocaine powder thus remains intact.[11]

■ The NAACP also claims that the finding in *Jones* that crack cocaine is more addictive than cocaine powder has been contradicted by the Sentencing Commission. It is true, as the NAACP contends, that any greater addictiveness of crack cocaine than cocaine powder stems not from their chemical compositions but from their common routes of administration. Indeed, the court in *Jones* apparently was unaware that cocaine powder can be injected and that injection "is even more likely to lead to addiction than is smoking." *Guideline Amendments*, 60 Fed.Reg. at 25077. However, the difference in addictiveness for purposes of rational review remains viable. Because only a small percentage of cocaine powder users inject the drug, a reasonable distinction between the two forms of cocaine can still be drawn on the basis of addictiveness. As the Court of Appeals noted in *Frazier*, even though injection is as harmful as snorting, "Congress is entitled to legislate for the general run of cases rather than the extremes." 981 F.2d at 96 n. 8.[12]

The *Jones* holding remains viable for two additional reasons. First, the findings of the Sentencing Commission do not refute the Court of Appeal's conclusion that the two forms of cocaine can be treated differently in the law because crack cocaine is cheaper to manufacture and purchase, and thus more widely available. Even standing alone, this rationale would satisfy equal protection at its lowest level. Second, although the court did not assert a direct connection between the use of crack cocaine and the increased incidence of violent crime, such a connection nevertheless provides a reasonable ground for a legislative body to penalize crack cocaine more severely. The NAACP points to the Sentencing Commission's preference to account for this difference through penalty enhancements within other guidelines. That an alternative exists, however, does not mean that a chosen path is unconstitutional.[13]

11. Whether the Commission is correct that the two forms of cocaine are "pharmacologically" identical is open to interpretation. At a public hearing, it was reported to the Commission that "cocaine is cocaine is cocaine," (*Special Report* at 203) (testimony of Dr. Charles R. Schuster, Senior Research Scientist at the Addiction Research Center of the National Institute of Drug Abuse), "[c]rack is . . . pharmacologically a more threatening material," *id.* at 204 (testimony of Dr. Robert Byck, Professor of Pharmacology at Yale University School of Medicine), and "the pharmacology of cocaine and crack is identical." *Id.* (testimony of Dr. Ira J. Chasnoff, President of the National Association for Perinatal Addiction and Professor of Pediatrics at the University of Illinois). This disagreement presumably stems from different understandings of the term "pharmacology." *See* The American Heritage Dictionary 982 (New College Ed.1976) (Pharmacology is "the science of drugs, including their composition, uses, and effects").

12. The Sentencing Commission concluded that the difference in addictiveness "is not a reliable basis for establishing longer penalties for crack cocaine" because of the possibility of injecting cocaine. *Id.* While this difference certainly is not as reliable as Congress and the *Jones* court first assumed, the court cannot say that the distinction is irrational.

13. The court notes that if it had examined the issue *de novo*, it might well have declared the sentencing scheme to be unconstitutional under rational review. While it is rational for a legislative body to provide different penalties for crack cocaine and cocaine powder, the court would have been inclined to find that a classification whereby a given amount of crack is treated the same as *100* times the same amount of powder is so disproportional as to be irrational, and not related in a rational way to the protection of the public welfare. *Frazier* foreclosed this possibility, however. The Court of Appeals explained that, unlike a proportionality analysis under the Eighth Amendment, "[t]he equal protection claim involves the justification for ·ny *differential at all* of cocaine base and cocaine." 981 F.2d at 96, n. 7 (emphasis added). In other words, the guarantee of equal protection of the laws does not enable a court to react to the proportionality of a classification, no matter how unreasonable.

In sum, although the Sentencing Commission's findings contradict some of the assumptions leading to the 100:1 ratio and led it to propose a 1:1 ratio, they do not, even if ultimately adopted by Congress, warrant the conclusion that no rational distinction can be drawn in devising penalties for crack cocaine and cocaine powder. This conclusion was reached by the Sentencing Commission itself: "[T]he Commission concludes that a policymaker could infer that crack cocaine poses greater harms to society than does powder cocaine." *Special Report* at 195. This conclusion also comports with the holding of every circuit court that has applied rational review to the cocaine sentencing scheme; like the Court of Appeals in *Jones*, each has found the scheme constitutional. *See, e.g., United States v. King,* 972 F.2d 1259, 1260 (11th Cir.1992); *United States v. Cyrus,* 890 F.2d 1245, 1248 (D.C.Cir.1989). *See also Frazier,* 981 F.2d at 96 (Eighth Amendment) (reasonable grounds for distinguishing between crack and powder exist "including differences in the purity of the drug, the dose size, the method of use, the effect on the user, and the collateral social effects of the traffic in the drug"). *But see State v. Russell,* 477 N.W.2d 886 (Minn.1991) (applying a more stringent standard of equal protection rational review under state constitution and finding 10:3 ratio between cocaine powder and crack cocaine under state penalty scheme unconstitutional).

Moreover, in *Alton,* the Court of Appeals for the Third Circuit stood by its conclusion in *Jones* that Congress had a rational basis for treating the two substances differently. *Alton,* 60 F.3d at 1069–70 (citing the finding in *Jones* that there are chemical differences between the two forms of cocaine, and noting that other courts have emphasized crack cocaine's potency, addictiveness, the ease with which it can be carried and concealed, and the violence it produces). Although the Court of Appeals noted that the district court had based its decision to depart downwards

in part "on indications that Congress has reconsidered the rationality of the 1 to 100 ratio," *Id.,* 60 F.3d at 1068, it did not address the conclusions and recommendations of the Sentencing Commission. Nevertheless, even if this court were to agree with the NAACP, it would be extremely hesitant to depart from this Third Circuit precedent.

### C.  Conclusion

The current sentencing scheme for cocaine offenses has the effect of incarcerating for lengthy periods young black men who distribute crack cocaine while white distributors of cocaine powder, the drug from which crack cocaine is derived, receive comparatively light sentences. Although this scheme might not be soft on crime, it has been soft on equality. The court's role, however, is to pass judgment on the constitutionality of the penalty provisions, not on their wisdom. Accordingly, the court finds that the 100:1 ratio between cocaine powder and crack cocaine in the cocaine sentencing scheme does not violate the equal protection component of the Fifth Amendment's Due Process Clause.

An appropriate order follows.

### *ORDER*

AND NOW, this 21 day of August, 1995, upon consideration of Defendant's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, and the government's response thereto, it is hereby ORDERED that the motion is DENIED.

---

Moreover, the Court of Appeals found that the proportionality of the 100:1 ratio did not constitute cruel and unusual punishment under the Eighth Amendment. It found that the 100:1 ratio was within the discretion of the legislature. *Id.* at 96. *But see United States v. Walls,* 841

F.Supp. 24 (D.D.C.1994) (cocaine sentencing scheme constitutes cruel and unusual punishment in violation of the Eighth Amendment as it applied to two defendants). The Sentencing Commission's recent findings would not likely change this result.