97 F.3d 1455
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lonzo WILLIAMS, Defendant-Appellant.
 No. 95-2007.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 4, 1996.
Decided Sept. 9, 1996.
Rehearing Denied Oct. 23, 1996.
 
 Before ROVNER, DIANE P. WOOD and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Lonzo Williams was convicted by a jury of knowingly and intentionally distributing approximately 33.5 grams of crack cocaine on July 19, 1994; approximately 61.3 grams of crack cocaine on July 25, 1994; and approximately 41 grams of crack cocaine on August 9, 1994. He was sentenced to the mandatory minimum sentence of ten years' imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), to be followed by five years of supervised release.
 
 
 2
 Williams appeals contending that he was the victim of both sentencing entrapment and sentencing manipulation. He argues that because of this he should receive a departure from the ten year mandatory minimum sentence imposed for his convictions. He also contends that the sentencing provisions of 21 U.S.C. § 841(b) lack a rational basis in violation of the Due Process Clause; that 21 U.S.C. § 841(b) has a racially discriminatory purpose in violation of the Equal Protection Clause, and that 21 U.S.C. § 841(b) is ambiguous. He further claims that the evidence at trial was insufficient for the jury to find him guilty of Count two of the indictment and that the district court abused its' discretion in denying his motion for a new trial. Finding no merit to any of his claims, we affirm the judgment of the district court.
 
 I.
 
 3
 Sidney Parham and Lonzo Williams are cousins. On July 19, 1994, FBI Agent Howard Schwartz, arranged for Parham, a cooperating witness with the FBI and an ex-convict, to page Williams from an apartment on South Homewood Street in Chicago in which a recording device had been installed. Williams returned the page and the following conversation ensued:
 
 
 4
 WILLIAMS: Ha, ha, ha, is you ready?
 
 
 5
 PARHAM: Ah, are you ready?
 
 
 6
 WILLIAMS: I stay ready.
 
 
 7
 PARHAM: Dig this here. I need two o's.
 
 
 8
 WILLIAMS: Yeah.
 
 
 9
 PARHAM: Okay, I got to have them cooked.
 
 
 10
 WILLIAMS: Right.
 
 
 11
 PARHAM: Now, how much it's gone cost me?
 
 
 12
 WILLIAMS: It's gone cost you, uhh, eighteen.
 
 
 13
 PARHAM: Eighteen?
 
 
 14
 WILLIAMS: Yeah.
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 PARHAM: Okay, how long I got to wait?
 
 
 18
 WILLIAMS: I got to come get your money.
 
 
 19
 PARHAM: Then how long I got to wait.
 
 
 20
 WILLIAMS: I don't, 'bout half an hour after that I got to get to the crib and cook it.
 
 
 21
 Again on July 19, 1994, Parham, in another telephone call to Williams, noted that he had the purchase price for the two ounces of crack cocaine discussed in the earlier conversation. Parham, once again, stated that he needed "two o's," and the following conversation took place:
 
 
 22
 WILLIAMS: Now, uh, uh, if you want me to, I'll come get the money and go drop it off and I'll shoot back with the shit raw. Let you see before I go cook it up.
 
 
 23
 PARHAM: No.
 
 
 24
 WILLIAMS: I got some excellent shit.
 
 
 25
 PARHAM: I'm fixin' to ... what, I want it cooked up.
 
 
 26
 WILLIAMS: Right.
 
 
 27
 PARHAM: Okay.
 
 
 28
 WILLIAMS: Bring it to you fried.
 
 
 29
 PARHAM: Right, bring it to me fried ...
 
 
 30
 That day Williams traveled to the apartment on Homewood twice. On one trip he picked up money that Agent Schwartz had provided to Parham for the purchase; on the second trip he delivered the ordered crack cocaine weighing approximately 33.5 grams.
 
 
 31
 During trial Parham testified that "two o's" meant two ounces and when he spoke of them "cooked" he was speaking about crack cocaine rather than powder cocaine.
 
 
 32
 On July 25, 1994, Parham again spoke with Williams from the apartment on Homewood. Parham said that he was "ready for three, man," meaning three ounces of cocaine. In a subsequent conversation, Williams and Parham discussed the price of cocaine and then the following exchange took place:
 
 
 33
 WILLIAMS: Ah man, you want 'em ah hard right.
 
 
 34
 PARHAM: Huh, yeah. I want 'em cooked.
 
 
 35
 WILLIAMS: Alright, I got to, ah, come on by there. I'm going to send my girl in there to get the ends. When she let me know she got 'em I'm gonna start cooking.
 
 
 36
 During trial Parham testified that he understood Williams' reference to "hard", to mean cocaine that had been cooked rather than cocaine in powder form.
 
 
 37
 Very soon after this conversation, Williams and a friend named Karen Daniels came to the apartment on Homewood. Parham paid Williams for the three ounces of crack cocaine. Later that evening, Williams and Daniels returned to the apartment and Daniels handed Parham 61.3 grams of crack cocaine.
 
 
 38
 The third and last transaction between Parham and Williams took place on August 9, 1994. Parham called Williams and when Williams returned the call, Parham said "I need a trey piece," which Parham testified at trial meant three ounces. Once again Williams came to the apartment to be paid by Parham and then later returned with the crack cocaine which weighed 41 grams.
 
 II.
 
 39
 We turn first to Williams argument that because he was the victim of unlawful sentencing manipulation and sentencing entrapment, the mandatory minimum sentence of ten years should be vacated.
 
 
 40
 Williams argues that the government engaged in sentencing manipulation because Parham asked Williams to supply crack cocaine ("cooked") instead of powder cocaine. "Sentencing manipulation occurs when the government engages in improper conduct that has the effect of increasing a defendant's sentence." United States v. Garcia, 79 F.3d 74, 75 (7th Cir.1996) (citing United States v. Cotts, 14 F.3d 300, 306 n. 2 (7th Cir.1994)), petition for cert. filed (June 20, 1996) (No. 95-9454); see also United States v. Okey, 47 F.3d 238, 240 (7th Cir.1995). We concluded in Garcia, however, that "there is no defense of sentencing manipulation in this circuit." 79 F.3d at 76. We likewise have made clear that there is no defense based on assertedly outrageous government conduct. United States v. Boyd, 55 F.3d 239, 241 (7th Cir.1995), see also United States v. Garcia, 89 F.3d 362, 367 (7th Cir.1996). Williams is thus left solely with a claim of sentencing entrapment.
 
 
 41
 Sentencing entrapment takes place "when the government causes a defendant initially predisposed to commit a lesser crime to commit a more serious offense." Garcia, 79 F.3d at 75; see also Okey, 47 F.3d at 240 n. 3. Williams agrees that he had the predisposition to supply powder cocaine but he argues that Parham, the cooperating informant, insisted that it be "fried." He therefore claims that he was induced by Parham, his cousin and friend, to supply crack cocaine, which carries a greater penalty than the powder variety. It is true, as Williams argues, that it was Parham who asked Williams to provide him with crack cocaine. However, nowhere on the tapes is there any intimation whatsoever of any reluctance by Williams to sell crack cocaine. He agreed to sell crack cocaine without even the slightest pause, showing familiarity and expertise with crack cocaine and its manner of preparation. Thus, as the government rightly claims, it did not turn a dealer of powder cocaine into a dealer of crack cocaine. On the contrary, the investigation, the tapes, and Williams' behavior all plainly prove that he was a crack cocaine dealer who was perfectly willing and prepared to sell cocaine in crack form. Under these circumstances, the district court by no means clearly erred in finding that Williams was not the victim of sentencing entrapment.
 
 III.
 
 42
 Williams' arguments regarding the constitutionality of the enhanced penalties for the distribution of crack cocaine provided for in 21 U.S.C. § 841(b) need not hold us long. Williams' due process argument was rejected in United States v. Lawrence, 951 F.2d 751, 755 (7th Cir.1991). Indeed, his primary argument rests on United States v. Clary, 846 F.Supp. 768 (E.D.Mo.1994), a district court case that was reversed by the Eighth Circuit on appeal. See United States v. Clary, 34 F.3d 709 (8th Cir.1994), cert. denied, 115 S.Ct. 1172 (1995). Williams' second argument rests on the Equal Protection Clause. But this circuit rejected that argument in United States v. Chandler, 996 F.2d 917, 918-19 (7th Cir.1993) (per curiam); see also United States v. Thomas, 86 F.3d 647, 655 (7th Cir.1996); United States v. Baker, 78 F.3d 1241, 1248 (7th Cir.1996); United States v. Jones, 54 F.3d 1285, 1293-94 (7th Cir.), cert. denied, 116 S.Ct. 263 (1995); United States v. Shorter, 54 F.3d 1248, 1253 n. 11 (7th Cir.), cert. denied, 116 S.Ct. 250 (1995); United States v. Blanding, 53 F.3d 773, 776 (7th Cir.1995). His third argument, that 21 U.S.C. § 841(b) is ambiguous because there is no meaningful distinction between crack cocaine and powder cocaine, was firmly repudiated in United States v. Booker, 70 F.3d 488 (7th Cir.1995), cert. denied, 116 S.Ct. 1334 (1996). See also Blanding, 53 F.3d at 776.
 
 IV.
 
 43
 Williams' final arguments, that the evidence at trial was insufficient for the jury to find him guilty of Count Two of the indictment, and that the district court abused its discretion in denying his motion for a new trial, are without merit. There was sufficient evidence regarding the sale of the 61.3 grams of crack cocaine that was the subject of Count Two to allow a jury to conclude that Williams distributed and possessed with intent to distribute the crack cocaine and that Daniels, who accompanied him, merely handed the package to Parham at Williams' instruction. Williams argues that at most, he was an aider or abettor of Daniels' possession. However, Daniels' only activity was to hand the package of drugs to Parham. It was Williams who handled all of the arrangements, returned all of the telephone calls placed by Parham, was paid by Parham, and had other crack cocaine dealings with Parham.
 
 
 44
 Last, Williams moved for a new trial on the ground that Parham had testified falsely when he denied having used drugs in the recent past. Ruling on Williams' motion, the district court assumed that "Parham perjured himself on the question of drug use while acting as an F.B.I. informant." The district court so assumed because Parham's mother testified that she suspected that Parham had been using drugs following his release from prison. The court nonetheless denied the motion because Williams did not show that it was likely that he would have been acquitted had the jury been aware of Parham's apparent drug use.
 
 
 45
 Having reviewed the trial record, we find no abuse of discretion in the district court's decision to refuse Williams' request for a new trial. As the district court pointed out, the essence of Parham's testimony was "supported by substantial independent evidence." In other words, although Parham may have been less than candid as to his drug use, the government's case against Williams did not, for the most part, hinge on his credibility. In any case, the jury heard Parham's mother testify on the matter of his drug use, and Williams thus had the benefit of the impeachment that her testimony supplied. Consequently, we too discern no possibility, reasonable or otherwise, that the jury might have reached a different conclusion had Parham been more forthcoming on this topic.
 
 V.
 
 46
 For the foregoing reasons, Williams' conviction on all three counts is AFFIRMED.